In the

# United States Court of Appeals

## For the Seventh Circuit

No. 06-3882

SANDRA L. VALENTINO,

*Plaintiff-Appellant,*

*v.*

VILLAGE OF SOUTH CHICAGO HEIGHTS, *et al.*,

*Defendants-Appellees.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 04 CV 2373—**William J. Hibbler**, *Judge.*

ARGUED MAY 12, 2008—DECIDED JULY 30, 2009

Before ROVNER, EVANS, and WILLIAMS, *Circuit Judges.*

WILLIAMS, *Circuit Judge.* In 2001, nepotism was alive and well in the Village of South Chicago Heights. Its small municipal government employed at least six members of its mayor's extended family, and several of his friends and campaign supporters. When Sandra Valentino allegedly discovered that the Village was paying several of these employees for hours that they did not actually work, she

discussed the situation with the future head of Citizens Against Corruption, William Bramanti. Bramanti sent a letter to the citizens of the Village detailing this alleged ghost payrolling and otherwise criticizing Mayor David Owen. Coincidentally, the next business day, Village Administrator Paul Petersen surreptitiously searched Valentino's desk and discovered that she had been photo-copying the office's employee sign-in sheets. Later that day, on the say-so of Mayor Owen, Petersen terminated Valentino's employment.

Valentino brought claims against Owen, Petersen, and the Village for First Amendment retaliation in violation of 42 U.S.C. § 1983 and for retaliatory discharge under Illinois law. Although the district court found that Valentino had stated a prima facie case for retaliation, it granted summary judgment for Defendants because it concluded that they had put forth a lawful, plausible reason for terminating Valentino, which she could not prove was pretextual. The district court also found that the Village was immune to Valentino's Illinois tort claim under section 2-201 of the Illinois Tort Immunity Act.

We agree with the district court that Valentino was speaking on a matter of public concern and that she stated a prima facie case for retaliation. However, we find that she has proffered sufficient evidence to cast serious doubt on the legitimacy of Defendants' stated reason for terminating her, such that a reasonable jury could conclude that it was a mere pretext for firing her for speaking out against the purported ghost payrolling. Further, we find that the district court erred in applying

section 2-201 of the Illinois Tort Immunity Act because it failed to consider that in order to be immune under this section, the alleged unlawful act must be a "policy decision." For these reasons, we reverse the district court's grant of summary judgment to Defendants.

## I. BACKGROUND

Sandra Valentino began working as a part-time secretary in the Village of South Chicago Heights' building department in 1989. From 1995 until 1997, she worked under William P. Bramanti, a building inspector with the Village. In 1997, the Village transferred her to the water department, where she performed various administrative tasks.

In November 2001, the Village hired Joe Minotti as a water inspector. Minotti allegedly told Valentino that he was hired because he was a "vote getter" for Defendant Mayor David Owen and an active supporter of his campaign for office. Valentino also allegedly observed that Minotti failed to send certain citizens appropriate water bills, failed to shut off their water in a timely manner, and fraudulently handled the purchase of his new home. After Valentino presented Minotti with a list of those water accounts that she believed he improperly handled, and complained about his actions to Mayor Owen, several Village Trustees, and Defendant Paul Petersen, Village Administrator, both Minotti and Valentino received reprimands.

Her concern about Minotti, whom the Village hired without prior public works experience, caused Valentino

to become skeptical of the Village's, or, more specifically, Mayor Owen's, hiring practices. Valentino notes that the Village employs several of Mayor Owen's friends and relatives, including Eric Faoro, Owen's son-in-law; Erika and Yvette Owen, Owen's daughters and Petersen's nieces; Scott Owen, Owen's son and Petersen's nephew; Sally Marrufo, and Ron Diederich. Valentino became suspicious that Mayor Owen sanctioned the "ghost payrolling" of these persons—that is, Valentino believed that the Village paid them salaries for hours that they did not actually work. Valentino noticed that several of these employees were rarely in the office but still received weekly paychecks. She communicated her concerns to Bramanti, who had quit in late 2001 or early 2002 because of conflicts with Owen. In these conversations, Valentino expressed her negative view of the nepotism in the Village's hiring practices.

After Valentino shared her suspicions with Bramanti, he submitted a series of requests pursuant to the Freedom of Information Act, looking to obtain copies of the time cards and sign-in sheets for Owen's associates and relatives. Petersen initially denied Bramanti's requests. On February 3, 2003, the same day that Petersen sent a letter to Bramanti denying his requests, Mayor Owen told another employee, Rose Bautista, that "[Valentino] is going to get her butt canned," ostensibly because of her relationship with Bramanti.[1] Several days

---

[1] Although there is no direct evidence that Owen or Petersen knew that Valentino was communicating with Bramanti

(continued...)

later, Mayor Owen overruled Petersen and released certain time records to Bramanti.

In the meantime, starting in February 2003, Valentino began to make copies of the daily sign-in sheets, in part to verify her suspicions regarding ghost payrolling and in part to determine if the Village was unfairly docking her pay when she was tardy, while not docking the pay of other Village employees. These sign-in sheets were left on the office counter, and employees, when they arrived at and left from the office, were supposed to sign in and out. Valentino communicated her observations regarding these sign-in sheets to Bramanti.

On February 28, 2003, when he did not receive a full response to his FOIA requests and learned of Valentino's observations regarding ghost payrolling, Bramanti, through his organization, Citizens Against Corruption, sent a letter to the citizens of the Village accusing Owen of ghost payrolling his relatives and of various other indiscretions.

On March 3, 2003, the next business day after he sent this letter, and days after he submitted another FOIA request to the Village, Valentino arrived at her desk and

---

(...continued)

regarding ghost payrolling, it is undisputed that they knew that both Bramanti and Valentino were concerned about employment practices at the Village and that they were friends. Moreover, Petersen testified that he told Sally Marrufo not to talk to Valentino because she would pass information along to Bramanti.

found Petersen waiting for her. Before Valentino's arrival, Petersen had searched her desk and found copies of the employee sign-in sheets. Petersen consulted with Owen, who instructed Petersen to ask the Village's legal counsel if Owen could fire Valentino because she copied these sign-in sheets. Counsel told Petersen that copying the sign-in sheets was a lawful reason to terminate Valentino, and Petersen terminated her on March 3, 2003, after fourteen years of service to the Village.

Valentino (and Bramanti, who is not a party to this appeal) filed this section 1983 action, claiming that Owen, Petersen, and the Village retaliated against her for exercising her First Amendment rights and speaking out against Defendants' practices of nepotism and alleged ghost payrolling. The district court granted summary judgment for Defendants, and Valentino now appeals.

## II. ANALYSIS

### A. Valentino Has Satisfied All the Necessary Requirements to Reach Trial on Her Retaliation Claim

In order to establish a prima facie case of unlawful First Amendment retaliation, a public employee must establish that: (1) she engaged in constitutionally protected speech; (2) she suffered a deprivation likely to deter her from exercising her First Amendment rights; and (3) her speech was a motivating factor in her employer's adverse action. *Massey v. Johnson*, 457 F.3d 711, 716 (7th Cir. 2006). If a plaintiff establishes a prima facie case, the burden shifts to the employer to demonstrate that it

would have taken the same action in the absence of the protected speech. *Id*. at 717. If the employer carries this burden, the plaintiff may still reach trial by producing sufficient evidence to allow a reasonable fact finder to determine that the employer's reasons were merely a pretext for firing the employee, at least in part, for exercising her First Amendment rights. *Id*. We review *de novo* the district court's grant of summary judgment to Defendants based on its finding that a plaintiff failed to proffer sufficient evidence of pretext. *Id*. at 716.

### 1.  Valentino Established a Prima Facie Case of Retaliation

There is no dispute that Defendants, in firing Valentino, caused her to suffer an adverse action likely to chill her freedom of speech. The only questions for us to resolve in determining whether Valentino has stated a prima facie case for retaliation is whether she engaged in constitutionally protected speech and whether a reasonable fact finder could determine that her speech was a motivating factor behind her termination.

Valentino, as a public employee, does not relinquish all First Amendment rights merely because she works for the government. *Brooks v. Univ. of Wisc. Bd. of Regents*, 406 F.3d 476, 479 (7th Cir. 2005). That said, she does not have an unfettered right to express herself on all matters related to her public employment. *Id*. Instead, she has a protected right, in certain circumstances, to speak as a citizen addressing matters of public concern. *Garcetti v.*

*Ceballos*, 547 U.S. 410, 416-17 (2006). When "public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Id*. at 421. In order for us to find that Valentino engaged in constitutionally protected speech, we must determine that she spoke in the capacity of a private citizen and spoke on a matter of public concern. *Renken v. Gregory*, 541 F.3d 769, 773 (7th Cir. 2008).

Defendants argue that Valentino did not direct her speech at the public, but rather privately confided in Bramanti because her main concern was the docking of her pay, rather than ghost payrolling, which is arguably a matter of public concern. True, speech that addresses "a private or personal interest, as opposed to a community one, does not satisfy the standards for First Amendment protection." *Spiegla v. Hull*, 371 F.3d 928, 935 (7th Cir. 2004). However, we must look at the content of the speech as a whole, *Gazarkiewicz v. Town of Kingsford Heights, Ind.*, 359 F.3d 933, 942-43 (7th Cir. 2004), when determining if it addresses a matter of public concern. In making this argument, Defendants confuse their stated reason for firing Valentino (photocopying of the sign-in sheets) with her speech as a whole. Valentino admits that she photocopied the employee sign-in sheets in part because she was privately concerned with the docking of her pay. However, she communicated the information on these sheets to Bramanti, and, more importantly, discussed her suspicions regarding the issue of ghost payrolling with Bramanti long before she began copying them.

Whether a statement rises to the level of public concern is a question of law, and in answering this question we look to the "content, form, and context" of the statement. *Connick v. Myers*, 461 U.S. 138, 147-48, 148 n.7 (1983). Then we balance "the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Schad v. Jones*, 415 F.3d 671, 674 (7th Cir. 2005) (quoting *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968)).

It is by now well-established that speech protesting government waste addresses a matter of public concern and is therefore entitled to constitutional protection. *See, e.g.*, *Wainscott v. Henry*, 315 F.3d 844, 849 (7th Cir. 2003) ("An employee's ability to highlight the misuse of public funds or breaches of public trust is a critical weapon in the fight against government corruption and inefficiency."); *see also Miller v. Jones*, 444 F.3d 929, 935 (7th Cir. 2006); *Brooks*, 406 F.3d at 484 (finding that government corruption is a quintessential matter of public concern). Ghost payrolling—paying public employees with taxpayer dollars for hours that they do not work—is a prime example of such waste. Here, although Valentino might have been personally concerned that the Village was docking her pay, her comments to Bramanti strongly implicate the public concerns of government corruption and waste caused by ghost-payrolling. Her speech need not be directed at supervisors or at a large contingent of the public to be protected. It is enough that she spoke on a matter of public concern to Bramanti,

a member of the public. Moreover, although we consider the motive of the speaker as part of the "context" in which the speech was made, *see Miller*, 444 F.3d at 937, "we have emphasized that speech of public importance is only transformed into a matter of private concern when it is motivated *solely* by the speaker's personal interests." *Gazarkiewicz*, 359 F.3d at 941-42 (emphasis added); *see also Breuer v. Hart*, 909 F.2d 1035, 1039 (7th Cir. 1990) ("[T]he fact that these serious allegations arose in the context of what began as a personal dispute does not in itself disqualify from protection all speech on the topics arising from that dispute"). Given that Defendants do not make an argument that their efficiency concerns outweigh the public concern raised by Valentino, we find that she has adequately shown that she engaged in constitutionally protected speech.

The next question is whether Valentino proffered sufficient circumstantial evidence to show that her protected speech was a motivating factor in Defendants' decision to terminate her employment. *See Massey*, 457 F.3d at 717. Valentino relies on her open complaints about her pay being docked vis-à-vis Owen's relatives, her relationship with Bramanti, and the suspicious timing of her firing to show that a reasonable jury could infer that Defendants fired her because she complained about ghost payrolling. Defendants retort that because Owen and Petersen, the persons who made the final firing decision, allegedly did not know that Valentino communicated with Bramanti regarding ghost payrolling, a jury cannot possibly infer that they fired her in retaliation for this communication. As the district court aptly noted,

it would be rare for a plaintiff to have smoking gun evidence that a defendant knew of her protected speech or for a defendant to admit such knowledge. Here, there is no direct evidence that either Owen or Petersen knew that Valentino was communicating with Bramanti. However, they knew that Valentino and Bramanti had a long-standing personal relationship, that Bramanti was submitting FOIA requests for certain employees' time sheets, and that Valentino was examining the office's master time sheets. Further, Petersen told at least one employee to stop talking with Valentino because she was passing information to Bramanti. In addition, the timing of Valentino's termination occurred just one business day after Bramanti released a letter to the public regarding ghost payrolling in the Village, and shortly after his series of FOIA requests. *See id.* ("Circumstantial proof, such as the timing of events or the disparate treatment of similar individuals, may be sufficient to establish the defendant's retaliatory motive."); *Culver v. Gorman & Co.*, 416 F.3d 540, 545-46 (7th Cir. 2005); *Holland v. Jefferson Nat'l Life Ins. Co.*, 883 F.2d 1307, 1314-15 (7th Cir. 1989). Although suspicious timing in and of itself is usually insufficient to create a triable issue, *Stone v. City of Indianapolis Pub. Utils. Div.*, 281 F.3d 640, 644 (7th Cir. 2002), the suspicious timing in this case combined with Defendants' knowledge of Valentino's relationship with Bramanti, Petersen's surreptitious search of her desk, and the timing of Owen's purported statement that she "is going to get her butt canned" is enough circumstantial evidence upon which a jury could conclude that Defendants terminated her, at least in part, because

she spoke out against the Village's supposed ghost payrolling.

**2. Valentino Has Presented Sufficient Evidence From Which A Jury Could Infer that Defendants' Stated Reason for Terminating Her Employment Was Pretextual**

Defendants contend that Valentino's "theft" of the office sign-in sheets was their true motivation for firing her. Defendants claim they were worried that such "theft" could lower office morale, foster identify theft, constitute an invasion of the Village's employees' privacy, or have other deleterious effects. The district court, finding that "Valentino has produced no evidence that the Village's concern about employee privacy was pretextual," granted Defendants' motion for summary judgment. In doing so, the district court suffered the misapprehension that a plaintiff necessarily must proffer *different or additional* evidence to rebut pretext from that she used to establish her prima facie case. This is not so. Often, the same evidence used to establish the prima facie case is sufficient to allow a jury to determine that a defendant's stated reason for terminating a plaintiff was a mere front for an ulterior, unlawful motive. *See, e.g., McGreal v. Ostrov*, 368 F.3d 657, 681 (7th Cir. 2004) (citing *Glass v. Dachel*, 2 F.3d 733, 743-44 (7th Cir. 1993)) (finding defendant's *post hoc* explanation of employee's termination "too fishy" to allow summary judgment); *Holland*, 883 F.2d at 1313 (holding that plaintiff may reach trial

by showing, through circumstantial evidence, that employer's articulated reason for its action was not worthy of credence and was thus pretextual); *Collin v. Illinois*, 830 F.2d 692, 705 (7th Cir. 1987) (same).

Here, there are several factors that a jury may examine in deciding not to give credence to Defendants' stated reason for firing Valentino. Valentino did not "steal" the sign-in sheets. She did not remove them from the Village's office. She simply photocopied them and stored them in her desk. We fail to see how this behavior differs from Valentino simply writing down the times that each employee clocks in and out. Any argument pertaining to the privacy of the information on these sheets is specious at best. The sign-in sheets were publicly displayed in the office, and the Village enacted the sign-in policy to create transparency in the arrival and departure times of the Village's employees. Moreover, the Village had already publicly released some of the information on these sign-in sheets when it partially granted Bramanti's FOIA requests. Given that these times were available for all to see, a jury may be hard pressed to find any substantial privacy concerns implicated in Valentino's copying of them. With regards to Defendants' professed fear that Valentino was committing "identity theft," unless the employees were required to sign into work using their social security and credit card numbers, we fail to see any evidence that even remotely supports this belief.

These factors, combined with the fact that Petersen singled out Valentino's desk to be searched after hours,

make the Village's explanation "too fishy", or, put another way, "too convenient," to allow summary judgment in Defendants' favor. It seems unlikely that Petersen would randomly decide to search only Valentino's desk and terminate her shortly thereafter, coincidentally, on the same day that Bramanti's latest letter was released. *See McGreal*, 368 F.3d at 681 ("The timing of these events provides a genuine issue of fact regarding the true reason for the Department's actions against McGreal. The timing demonstrates an extreme displeasure with the content of McGreal's statements just as easily as it indicates a concern for potential disruption in the Department."). This is especially true because Valentino's termination occurred without warning after nearly fifteen years of uninterrupted service. *See Spiegla*, 371 F.3d at 943 ("Taken together, the closely related sequence of events, Spiegla's long and uninterrupted tenure, and Johnson's anger with Spiegla demonstrate that Spiegla's speech was a motivating factor in the decisions to transfer her and to change her shift.").

This is not to say that it is impossible for Defendants to have been motivated, in part, by Valentino's photo-copying of the sign-in sheets when they decided to terminate her employment. However, as we have stated before, a retaliatory animus need not be the sole motive behind a termination decision for a plaintiff to have an actionable claim. *Id.* at 942. Rather, it need be only one factor in the employer's decision. *Id*. ("[A] motivating factor does not amount to a but-for factor or to the only factor, but is rather a factor that motivated the defendant's actions."). Since Valentino has shown that a

reasonable jury could find that an improper purpose was a motivating factor in her termination, the burden shifts to Defendants "to prove by a preponderance of the evidence that the same actions would have occurred in the absence of the protected conduct." *Id.* at 943 (citing *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977)). Here, Defendants have failed to meet that burden. Aside from showing that Defendants' proffered reason is specious at best, the evidence establishing Valentino's prima facie case is substantial enough to allow a jury to infer that Defendants' assertion that they fired Valentino for "theft" of the sign-in sheets was mere pretext. Given that the evidence Valentino has offered established a prima facie case of retaliation, and is enough to rebut Defendants' proffered reason for terminating her, we reverse the districts court's grant of summary judgment to Defendants.

## B. Valentino's *Monell* Claim May Proceed to Trial Because the Evidence Indicates That Mayor Owen Was a Policymaker for the Village Regarding Hiring/Firing Decisions

A municipality, such as the Village, may be liable for a section 1983 violation if, among other things: (1) it has a permanent and well-settled municipal custom or practice that, although not authorized by official law or policy, was the moving force behind the plaintiff's constitutional injury; or (2) an individual with final policy-making authority for the municipality (on the subject in question) caused the constitutional deprivation. *Monell*

*v. City of New York*, 436 U.S. 658, 690 (1978); *Simmons v. Chicago Bd. of Educ.*, 289 F.3d 488, 494 (7th Cir. 2002). *Monell* liability is not a form of respondeat superior; instead, a municipality can only be held liable "when execution of [its] policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible for under section 1983." *Monell*, 463 U.S. at 694. Here, Valentino seeks redress under both of the aforementioned theories. As to the first theory, the district court correctly concluded that Valentino could not show that the Village had a custom or practice of sanctioning retaliation in violation of the First Amendment. Valentino alleges that Mayor Owen had denied benefits or otherwise attempted to quash the speech of former political opponents and their associates.[2] "If the same problem has arisen many times and the municipality has acquiesced in the outcome, it is possible (though not necessary) to infer there is a policy at work." *Lewis v. City of Chicago*, 496 F.3d 645, 656 (7th Cir. 2007) (quoting *Phelan v. Cook County*, 463 F.3d 773, 789 (7th Cir. 2006) (quoting

---

[2] Among other things, Valentino alleges that Owen and/or Petersen: (1) denied a political opponent, Joe Kudra, insurance benefits; (2) denied a supporter of Kudra, Rosario DelGroso, "pickup of debris that would otherwise normally take place"; (3) sent a letter to Valentino's stepfather, demanding that he pay $3.25 or have his water shut off; and (4) threatened to fire George Ellis unless he moved out of the house of one of Owen's political rivals.

*Calhoun v. Ramsey*, 408 F.3d 375, 380 (7th Cir. 2005))). Valentino has failed to establish that the Village has condoned a continual practice of terminating employees who speak out against Mayor Owen or his political allies. Valentino does not contend that any of these alleged instances of retaliation ever resulted in a meritorious lawsuit or settlement. Further, she does not provide tangible evidence of what exactly these persons' "speech" consisted of or whether it was constitutionally protected. She also fails to adequately delineate how Owen's response to these persons' speech was designed to quell their First Amendment expression. In short, although Valentino presents evidence of possible retaliation against others, she does not show how these separate incidents weave together into a cognizable Village policy. She fails to "introduce evidence demonstrating that the unlawful practice was so pervasive that acquiescence on the part of policymakers was apparent and amounted to a policy decision." *Phelan*, 463 F.3d at 790.

Valentino's second theory, that Owen was the official policymaker for the Village on issues involving hiring and firing, merits further scrutiny. It is well-established that when a particular course of action is directed by those who set municipal policy, the municipality is responsible under section 1983, even if the action in question is undertaken only once. *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480-81 (1986). Valentino contends that because Owen made the ultimate decision to fire her, *Monell* liability should apply. But just because Owen is the *decisionmaker* on hiring/firing decisions for the Village government does not necessarily make him the

*policymaker* on those issues. "The fact that a particular official—even a policymaking official—has discretion in the exercise of particular functions does not, without more, give rise to municipal liability based on an exercise of that discretion." *Id*. at 481-82. Rather, such an official also must be responsible for establishing final government policy on a particular issue. *Id*. at 482-83 (finding that prosecutor who had authority to make final decision about warrantless entry into home was a policymaker for municipality). The determination of whether a person has policymaking authority is a question of state law, and is to be decided by the court. *Id*.; *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 737 (1989); *Kujawski v. Bd. of Comm'rs of Bartholomew County, Ind.*, 183 F.3d 734, 737 (7th Cir. 1999). Our inquiry is not whether an official is a policymaker on all matters for the municipality, but whether he is a policymaker "in a particular area, or on a particular issue"; here, the relevant question is whether Mayor Owen is a policymaker on personnel decisions. *Kujawski*, 183 F.3d at 738 (citing *McMillian v. Monroe County*, 520 U.S. 781, 785 (1997)). Officials with *final* decisionmaking authority are deemed policymakers for *Monell* purposes, and we need to look to state law to determine the scope of such authority. *See Pembaur*, 475 U.S. at 480; *City of St. Louis v. Praprotnik*, 485 U.S. 112, 134 (1988); *Jett*, 491 U.S. at 737.

Helpful in determining whether an official is a final decisionmaker is an inquiry into: (1) whether the official is constrained by policies of other officials or legislative bodies; (2) whether the official's decision on the issue in question is subject to meaningful review; and

(3) "whether the policy decision purportedly made by the official is within the realm of the official's grant of authority." *Randle v. City of Aurora*, 69 F.3d 441, 448 (10th Cir. 1995) (citing *Praprotnik*, 485 U.S. at 127)*.* Also helpful is an examination of not only "positive law, including ordinances, rules and regulations, but also the relevant customs and practices having the force of law." *Mandel v. Doe*, 888 F.2d 783, 793 (11th Cir. 1989) (finding that custom dictated that physician's assistant, and not supervising doctor, had final policymaking authority with respect to medical decisions made at road prison) (citing *Jett*, 491 U.S. at 722); *Kujawski*, 183 F.3d at 737 ("Customary practices having the force of law may be considered as proof of delegation.").

It is clear that Mayor Owen is a decisionmaker with regards to personnel decisions within the Village. He has placed at least five of his family members and several friends on the Village payroll. Owen, admittedly, had the final say-so regarding the termination of Valentino. Moreover, several Village ordinances indicate that Mayor Owen makes personnel decisions regarding Village employees. For example, Section 2-117 states: "The village administrator shall not be responsible for the hiring, firing, discipline, conducting of employment-related hearings or other personnel matters, unless otherwise specified herein or as lawfully *instructed by the village president*[3] or board of trustees" (emphasis added). Section 2-115(3) states that the Village Administration has

---

[3] It appears as though the terms "president" and "mayor" are used interchangeably.

the power to: "Make recommendations *to the village president* regarding hiring, discipline, and discharge of employees . . . ," indicating that the Owen, as mayor or village president, has the ability to make personnel discharge decisions (emphasis added).

However, just because Owen makes personnel decisions does not necessarily mean that he is the *final* decisionmaker on such matters such that he can be considered a policymaker for the Village in this area. It is a "well-established principle that the mere unreviewed discretion to make hiring and firing decisions does not amount to policymaking authority. There must be a delegation of authority to set policy for hiring and firing, not a delegation of only the final authority to hire and fire." *Kujawski*, 183 F.3d at 739 (citing *Venters v. City of Delphi*, 123 F.3d 956, 966 (7th Cir. 1997)); *Radic v. Chicago Transit Auth.*, 73 F.3d 159, 161 (7th Cir. 1996); *Auriemma v. Rice*, 957 F.2d 397, 401 (7th Cir. 1992). The Village argues that the Board of Trustees, and not Owen, is the final decisionmaker because it says the Board sets personnel policy and reviews termination decisions, whereas Owen merely has discretion to carry out the policy set by the Board. *See Partee v. Metropolitan Sch. Dist. of Washington Twp.*, 954 F.2d 454, 462 (7th Cir. 1992) (holding that where school board had final say-so on personnel matters, principal of school was not policymaker for municipality).

A defendant municipality in *Kujawski* sought refuge from *Monell* liability under the same theory. 183 F.3d at 739. There, a plaintiff sued a municipality claiming that

it was liable under *Monell* for the actions of the municipality's Chief Probation Officer, who fired the plaintiff from his job as a probation officer after he complained about some of the office's policies. *Id*. We recognized the fact that our precedent had established that unreviewed discretion to make employment decisions does not rise to the level of policymaking authority, but nonetheless found that summary judgment was inappropriate because a fact issue remained regarding whether the municipality's board had delegated policymaking authority on the office's personnel decisions to the Chief Probation Officer. *Id*. at 740. Key in our reasoning was that the plaintiff provided evidence that: (1) the board did not review the Chief's personnel decisions; and (2) the Chief was completely in charge of the probation department. *Id*. We concluded that the evidence "permits the reasonable inference that the Commissioners delegated to Officer Parker the authority to make employment policy decisions with respect to community corrections employees" and remanded the matter for trial on plaintiff's *Monell* claim. *Id*.

*Kujawski* shares several important similarities, and several important differences, with this case. Unlike here, in *Kujawski*, because it was unambiguous that: (1) the community corrections advisory board "may establish personnel policies" for the probation department; (2) any terminated probation officer had a right to a grievance hearing in front of the county board of commissioners; and (3) the county judges had the authority to hire probation officers, we found that there was a question of fact regarding whether the Chief's decisions were reviewed or constrained in such a way that he was not actually

the *final* decisionmaker on personnel decisions for the county's probation office. *Id*. at 738-39. In other words, several concrete hiring/firing policy mechanisms existed that were in the hands of various quasi-legislative bodies and not in the hands of the Chief Probation Officer, which could have had an impact on who was the actual final decisionmaker on personnel matters. *See id*. Therefore, to the extent that the evidence indicated that the Chief had unfettered discretion to hire and fire employees on his whim and that his decisions were not meaningfully constrained or reviewed, we found it necessary to remand for a factual determination of whether these legislative bodies had in fact delegated their policy making authority to the Chief, thus subjecting the municipality to the possibility of *Monell* liability. *Id*. at 740.

Not so here. Defendants do not point to any laws, statutes, or ordinances which place policy setting authority in the hands of the Village's board of trustees. To the contrary, all the evidence suggests that Mayor Owen had the unfettered discretion to hire and fire whomever he pleased. Indeed, he hired several of his relatives and fired Valentino and others without as much as a whisper from the board of trustees. Given that the Village has a population of only a few thousand people and is run by a small government, a legislative framework for personnel decisions may not actually exist, and Defendants have not provided evidence of any. Rather, the evidence suggests that as head of the government, Mayor Owen may hire or fire whomever he wants in the routine course of business. Therefore, in this case, unlike in *Kujawski*, given that there is no presumption of policymaking authority in the hands of any quasi-legisla-

tive body, it is unnecessary for there to be any factual inquiry into whether that body delegated its authority to Mayor Owen. To the contrary, given Mayor Owen's preference to hire his relatives and campaign supporters to government jobs, it appears to be a Village custom/practice to allow Owen to set whatever hiring/firing criteria he sees fit.

As in *Kujawsk*i, Defendants cannot point to any edicts from the board of trustees that in any way govern the manner in which Mayor Owen may make his hiring or firing decisions. Nor do they point to any instances in which the board provided any meaningful oversight of Mayor Owen's decisionmaking process or meaningfully reviewed his termination decisions. Instead, all the evidence indicates that Mayor Owen, either personally or by his own delegation, makes the personnel decisions for his office. Therefore, it is clear to us that Mayor Owen is the *de facto* policymaker for the Village with regard to personnel decisions in his office. Given this, we reverse the district court's decision on Valentino's *Monell* claim and find that Valentino has shown that Owen is a final policymaker for the Village, such that the Village may be held liable if the jury finds that Mayor Owen and Village Administrator Petersen retaliated against her in violation of her First Amendment rights.

## C. The Illinois Tort Immunity Act Does Not Immunize Defendants Against Valentino's Retaliatory Discharge Claim

Valentino also alleges that the Village is liable under the Illinois tort of retaliatory discharge based on her

unlawful termination. In Illinois, to recover for retaliatory discharge, a plaintiff must show that he was discharged "in retaliation for his activities, and that the discharge be in contravention of a clearly mandated public policy." *Horton v. Miller Chem. Co., Inc.*, 776 F.2d 1351, 1355 (7th Cir. 1985) (quoting *Palmateer v. Int'l Harvester Co.*, 421 N.E.2d 876, 881 (Ill. 1981)) (holding that there is no precise definition of public policy and that "concerns what is right and just and what affects the citizens of the State collectively"). Terminating a government employee for speaking out against corruption in her workplace is surely contrary to clearly mandated public policy (the intersection of the First Amendment and the public's right not to be defrauded by its government); the Village does not contend otherwise. Nor does the Village assert that she cannot state a prima facie case for this tort (other than the same arguments it raises against her section 1983 claim). *Cf. Fellhauer v. City of Geneva*, 568 N.E.2d 870, 877 (Ill. 1991) (recognizing that this tort is to be construed narrowly, but noting that it may be viable in speaking against municipal corruption).

   Instead, the Village contends that section 2-201 of the Illinois Tort Immunity Act exempts Owen and Petersen from liability, thus negating the claim against the Village. This section provides that "a public employee serving in a position involving the determination of policy or the exercise of discretion is not liable for an injury resulting from *his act or omission in determining policy* when acting in the exercise of such discretion even though abused." 745 ILCS 10/2-201 (emphasis added). The Village essentially reasons, and the district relies on the fact, that

section 2-201, "together with section 2-109 (745 ILCS 10/2-109 ('a local public entity is not liable for an injury resulting from an act or omission of its employee where the employee is not liable')), provides both public employees and the public employer with immunity against allegations that challenge discretionary policy determinations." *Murray v. Chicago Youth Ctr.*, 864 N.E.2d 176, 185-86 (Ill. 2007) (citations omitted).[4]

The Village is not immune under the Act, however, because, in order to receive immunity under section 2-201, the municipal official must have been making a "policy decision" when committing the alleged retaliatory act. Section 2-201 immunizes an individual defendant only to the extent that the action he is being sued for involves both the making of a policy choice and the exercise of discretion. *Van Meter v. Darien Park Dist.*, 799 N.E.2d 273, 285 (Ill. 2003) ("[O]ur cases have made clear that there is a distinction between situations involving the making of a policy choice and the exercise of discretion. Municipal defendants are required to establish both of these elements in order to invoke immunity

---

[4] The Illinois Supreme Court, in *Smith v. Waukegan Park Dist.*, 896 N.E.2d 232, 236-37 (Ill. 2008), called into doubt a municipality's ability to combine sections 2-201 and 2-109 to extend immunity from a municipal official to the municipality itself. It reasoned that where the municipality is the pertinent actor that performed the alleged retaliatory action, section 2-109 is not implicated. We need not delve into this line of reasoning, however, because we determine that section 2-201 does not immunize the Village.

under section 2-201.") (citations omitted). The Illinois
Supreme Court has defined "'discretionary' actions to
be those 'unique to a particular public office.'" *Id*. at 286
(citations omitted). It also has "held that decisions re-
quiring a governmental entity to balance competing
interests and to make a judgment call as to what solution
will best serve those interests are 'policy decisions'
within the meaning of section 2-201." *Id*. (citations omit-
ted). Last, we note that "because the Tort Immunity Act
is in derogation of the common law, it must be strictly
construed against the public entities involved." *Id*. (citing
*Zimmerman v. Vill. of Skokie*, 697 N.E.2d 699, 707 (Ill. 1998)
(quoting *Aikens v. Morris*, 583 N.E.2d 487 (Ill. 1991))).

Defendants' attempt to argue that Owen's decision to
fire Valentino was a "policy decision" is futile. The
Village argues in one breath that Owen's series of hirings
and firings for the Village do not mean that he is a
policymaker, and in another breath that his decision to
fire Valentino was a policy decision. As discussed above,
its first argument is without merit as it applies to the
facts of this case. The second argument fails as well.
Here, Owen's one-time decision to fire one employee,
Valentino, does not amount to a "judgment call between
competing interests." In fact, we are at a loss to identify
any competing interests at all. Rather, Owen either
made a one-time decision to fire Valentino because she
copied the sign-in sheets or because she spoke out
against the Village's practice of ghost payrolling, or some
combination thereof. The Village offers no evidence that
it had a policy against copying the sign-in sheets either
before or after Valentino's termination. Even if such a

policy did exist, we cannot see how the decision to create it might involve competing interests and judgment calls that would meet the Illinois courts' definition of a "policy decision". *See id*. Therefore, the decision to fire Valentino does not amount to a policy decision as defined by the Illinois courts. So, the Village is not entitled to immunity under section 2-201.

## III. CONCLUSION

For the foregoing reasons, the judgment of the district court is REVERSED and this matter is REMANDED on all counts against all Defendants.