In the

# United States Court of Appeals

## For the Seventh Circuit

No. 09-2953

PAUL K. OGDEN,

*Plaintiff-Appellant,*

*v.*

JAMES ATTERHOLT, CAROL J. MIHALIK,
and the INDIANA DEPARTMENT OF INSURANCE,

*Defendants-Appellees.*

Appeal from the United States District Court
for the Southern District of Indiana, Indianapolis Division.
No. 1:08-cv-00369-JMS-DFH—**Jane E. Magnus-Stinson**, *Magistrate Judge.*

ARGUED APRIL 13, 2010—DECIDED MAY 18, 2010

Before WILLIAMS, SYKES, and TINDER, *Circuit Judges.*

SYKES, *Circuit Judge.* Oral argument has narrowed this appeal to a single issue: Did the Commissioner of the Indiana Department of Insurance and his Chief Deputy violate Paul Ogden's free-speech rights when they required him to resign as manager of the Department's Title Insurance Division? Ogden was forced out of his position after writing a memo to the Commissioner

criticizing the performance of his Chief Deputy and asking that the Title Insurance Division be removed from her control. He then sued the Commissioner, the Chief Deputy, and the Department of Insurance claiming that his memo was protected speech and his forced resignation violated his rights under the First Amendment. The district court entered summary judgment for the defendants and Ogden appealed.

We affirm. Ogden's complaints about the Deputy Commissioner and his request for a departmental reorganization were made in the performance of his professional duties as manager of the Title Insurance Division. Because he was speaking as a governmental employee and not a citizen when he wrote the memo, under *Garcetti v. Ceballos*, 547 U.S. 410 (2006), the protections of the First Amendment are not implicated.

## I. Background

In November 2006 Paul Ogden was hired as the manager of the newly created Title Insurance Division in the Indiana Department of Insurance. The Title Insurance Division was nestled within the Department's Consumer Protection Unit, headed up by Chief Deputy Commissioner Carol Mihalik. James Atterholt was the Commissioner of Insurance and in that capacity was responsible for the entire Department of Insurance. After taking the reins of the Title Insurance Division, Ogden very quickly began to resent Mihalik's management style; he thought she was emotionally erratic, forgetful, and

too easily distracted by trivial matters. He began working around Mihalik by reporting directly to Atterholt on at least some Division matters, a practice which Ogden claims Atterholt encouraged.

On September 14, 2007, Ogden informed Atterholt that he was planning to submit a formal request that the Title Insurance Division be removed from the Consumer Protection Unit; Ogden and Atterholt had apparently discussed this possibility previously. That same day Ogden met with representatives of the State Personnel Division to file a formal complaint against Mihalik. In particular, Ogden claimed that Mihalik (1) flouted Personnel Division regulations on hiring; (2) misused funds directed for the Title Insurance Division; and (3) fostered a hostile work environment. The Personnel Division informed Ogden that an investigation would be opened and that he should gather any relevant information.

Three days later Ogden wrote a lengthy memorandum to Atterholt, which Ogden described as a "formal request to have the Title Insurance Division removed from the Consumer Protection Unit." In the memo Ogden outlined 35 reasons in support of his reorganization request. Virtually all of these reasons involved allegations that Mihalik was incompetent or corrupt. Ogden's memo repeats many of the allegations he made three days earlier to the Personnel Division, but, importantly, the memo never references that formal complaint or asks that Mihalik be disciplined in any way. One of Ogden's final bullet points in the memo states: "If we at the

Title Division are required to continue under Ms. Mihalik's supervision, the short term impact will be a marked decline in morale and productivity of the Division. The long term impact will be that employees of the Division will leave and the Division may have to be disbanded."

A few hours after Atterholt received Ogden's memo, he summoned Ogden to a meeting. Mihalik was present with Atterholt at this meeting, and Ogden was informed that he had two choices: he could either resign or be fired. Ogden was told that he had been "out of line," but no other explanation for the resign-or-be-fired order was offered. Ogden was given no opportunity to defend himself against the charge that his memo had been "out of line." He chose resignation over termination and signed a "voluntary" resignation letter so that he could keep his accrued vacation time and avoid being placed on Indiana's "do not hire" list.

Ogden then sued Atterholt, Mihalik, and the Department of Insurance in Indiana state court, raising a host of state claims (including "whistle-blowing," unjust termination, and intentional infliction of emotional distress), as well as a claim under 42 U.S.C. § 1983 for violation of his First Amendment right to free speech. He also asserted a due-process claim, the precise nature of which has been the source of a fair amount of confusion during this litigation and requires further comment.

Ogden advanced his § 1983 claim in Count VII of his complaint, which alleged a free-speech violation but said nothing of due process. Ogden's due-process

allegations were lodged exclusively in Count VIII of his complaint, but that count is not entirely clear as to whether the due-process claim sounds in state or federal law (or both). In relevant part, Count VIII states: "The due process provided to Ogden falls short of meeting even the reduced standard required for at will employees under Indiana law, the Governor's Executive Order, and the Indiana and Federal Constitutions." But Count VIII makes no mention of § 1983.

The defendants removed the case to federal court, observing in their notice of removal that Ogden was bringing both a First Amendment claim and a federal due-process claim under § 1983. The magistrate judge assigned to handle this case apparently read Ogden's complaint in the same way during the course of the proceedings below.[1] So when the magistrate judge ruled on the defendants' motion for summary judgment, she addressed two questions: whether Atterholt and Mihalik had violated either Ogden's free-speech rights *or* his due-process rights under the Federal Constitution. The judge granted summary judgment for the defendants on both grounds and remanded the remaining state claims back to the Indiana court.

Ogden then filed this appeal. Based on the proceedings in the district court, his appeal initially appeared to

---

[1] In accordance with the provisions of 28 U.S.C. § 636(c) and Rule 73 of the Federal Rules of Civil Procedure, the parties consented to have a magistrate judge conduct all proceedings in the case.

encompass federal free-speech *and* due-process issues. But in his reply brief, and again at oral argument, Ogden told us that his due-process claim arose exclusively under Indiana law. Accordingly, the only issue for us is whether the magistrate judge properly granted summary judgment for the defendants on Ogden's First Amendment claim.

## II. Discussion

We review a grant of summary judgment de novo, construing all facts in the light most favorable to Ogden and drawing all reasonable inferences in his favor. *Reget v. City of La Crosse*, 595 F.3d 691, 695 (7th Cir. 2010). To establish a prima facie case that his First Amendment free-speech rights were violated, Ogden must first show that he engaged in constitutionally protected speech and that this speech was a motivating factor in his dismissal. *Valentino v. Vill. of S. Chi. Heights*, 575 F.3d 664, 670 (7th Cir. 2009).

The Supreme Court's decision in *Garcetti* governs the analysis of whether Ogden's memo is constitutionally protected speech. The Supreme Court reiterated in *Garcetti* that public employers, like private employers, are permitted to exercise a significant degree of control over their employees' words and actions. 547 U.S. at 418-19. Nonetheless, public employees remain citizens, and as such "[t]he First Amendment limits the ability of a public employer to leverage the employment relationship to restrict, incidentally or intentionally,

the liberties employees enjoy in their capacities as private citizens." *Id.* at 419. Accordingly, "[s]o long as employees are speaking as citizens about matters of public concern, they must face only those speech restrictions that are necessary for their employers to operate efficiently and effectively." *Id.* But the Court held that "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Id.* at 421. As the Court explained: "Underlying our cases has been the premise that while the First Amendment invests public employees with certain rights, it does not empower them to constitutionalize the employee grievance." *Id.* at 420 (quotation marks omitted).

Ogden wrote his memo to Atterholt in his capacity as the manager of the Title Insurance Division and pursuant to his official duties in that position—not as a private citizen. The stated purpose of the memo was to serve as a "formal request [to the Commissioner] to have the Title Insurance Division removed from the Consumer Protection Unit and to operate as a direct report or under a different Chief Deputy." In other words, Ogden was attempting to convince his ultimate superior, Commissioner Atterholt, that his immediate supervisor, Deputy Commissioner Mihalik, was unfit to oversee his division. To be sure, Ogden made many wide-ranging allegations in the five-page memo, but all of them were directed toward substantiating his

proposal that the Title Insurance Division be relocated within the Department of Insurance.

The memo speaks for itself. It was an effort to establish—rightly or wrongly—that Mihalik was incapable of properly supervising the Title Insurance Division, which Ogden was charged with directly administering. Ogden pulled no punches and listed 35 separate reasons why he thought Mihalik was unfit to exercise supervisory control over the Division. For instance, he stated that "Ms. Mihalik regularly displays erratic personal behavior that manifests itself in wide mood swings, forgetfulness, insecurity, and an inability to focus on tasks." Ogden also asserted that "Ms. Mihalik has caused and continues to cause numerous problems throughout the Department. Complaints about her behavior, from low level clerical staff to Chief Deputies, are an everyday feature of working at the Department of Insurance." The litany of grievances continued in this vein. Nor was Ogden shy about connecting the dots for Atterholt. At one point he proclaimed that "the future success of the Title Insurance Division will be impossible under Ms. Mihalik's supervision." Ogden also warned that "[i]f we at the Title Division are required to continue under Ms. Mihalik's supervision, the short term impact will be a marked decline in morale and productivity of the Division. The long term impact will be that employees of the Division will leave and the Division may have to be disbanded."

Ogden's memo reflects exactly the sort of localized employment-related speech *Garcetti* held was not entitled

to First Amendment protection. Ogden's request to have the Title Insurance Division transferred plainly falls within the scope of his official responsibilities as manager of the Division, and Ogden concedes as much. He insists, however, that his memo must be viewed as more than a reorganization request; he maintains that it was also a complaint about Mihalik's improper—and possibly unethical—behavior, which he argues is a matter of general public concern. For instance, he points to one of the 35 complaints he lodged against Mihalik: that she improperly directed funds intended for the Title Insurance Division to other pursuits. His memo also asserted that Mihalik repeatedly flouted state personnel rules in the hiring of employees.

Ogden thus suggests that we divorce the reorganization request from the charges of official misconduct—particularly the allegation that Mihalik misused Division funds. His argument is that although the reorganization request was made in the course of his official responsibilities, the reporting of the misuse of funds was not. He notes that Mihalik confirmed in her deposition that Ogden's official job description did not task him with the responsibility of monitoring the (mis)management of the Title Insurance Division Fund. These particular misconduct allegations, Ogden maintains, reflect the concerns of a private citizen rather than a public employee. For support he cites *Valentino v. Village of South Chicago Heights*, 575 F.3d at 671-72; we held there that "[i]t is by now well-established that speech protesting government waste addresses a matter of public

concern and is therefore entitled to constitutional protection."

Ogden's strained attempt to recast his memo as an exercise in whistle-blowing is unpersuasive. Ogden explicitly described his memo as a "formal request to have the Title Insurance Division removed from the Consumer Protection Unit and to operate as a direct report or under a different Chief Deputy." The specific "whistle-blowing" allegations that Ogden now relies on to fit himself within *Garcetti*'s requirement of private-citizen speech were part and parcel of the rationale he offered "in support of this request" for departmental reorganization. That is, everything in the memo was calculated to achieve the stated objective of removing the Title Insurance Division from the Consumer Protection Unit. It is true that three days before sending his memo, Ogden met with officials in the State Personnel Division in order to file a formal complaint regarding Mihalik's alleged hiring violations and misuse of the title insurance fund. But his memo neither references the disciplinary complaint against Mihalik nor recommends that she be disciplined or reprimanded in any other way. His memo was an official request by a division manager, acting in that capacity, asking for a departmental reorganization—no more, no less. "*Garcetti* made clear that public employees speaking pursuant to their official duties are speaking as employees, not citizens, and thus are not protected by the First Amendment regardless of the content of their speech*." Spiegla v. Hull*, 481 F.3d 961, 965 (7th Cir.

2007) (quotation marks omitted). Ogden's memo was the act of a public employee acting *as* a public employee, not a concerned citizen.[2]

Finally, *Valentino* is of no help to Ogden. The municipal employee in *Valentino* confided in a member of the public about her concerns that the local mayor was rewarding friends and family with suspect jobs in her department. We held that this speech—which led to a FOIA request and a complaint from a public-interest group—was constitutionally protected. 575 F.3d at 671-72. Ogden's situation is completely different. His memo was an internal, formal request to his ultimate supervisor asking that his department be reorganized. It did not purport to expose or remedy injustices of public importance; its aim was to persuade Atterholt that Mihalik was an unsuitable supervisor of Ogden's division and convince him to remove the division from her control. Accordingly,

---

[2] In arguing that at least portions of his memo must be considered protected speech, Ogden focuses on Mihalik's tacit admission that some of the accusations leveled in the memo involved areas outside Ogden's stated job description. While a formal job description may be of some use in discerning when a public employee is speaking pursuant to his official duties, it is hardly dispositive. An employee's "official responsibilities" can easily extend well beyond "core" job functions. *See Spiegla*, 481 F.3d at 966. The "official responsibility" inquiry requires a more commonsense, contextual analysis of the role the public employee assumed in making the speech at issue in the case. *See Garcetti*, 547 U.S. at 424-45.

Ogden's speech was not constitutionally protected, and summary judgment dismissing the First Amendment claim was appropriate.

We are left with one final housekeeping item. On appeal Ogden has expressed a concern that the magistrate judge's resolution of the due-process claim in favor of the defendants might foreclose litigation of that claim in the Indiana courts. As we have noted, Ogden clarified in his reply brief and at oral argument that his due-process claim is based entirely on state law; as such, once the federal free-speech claim was resolved against him, the due-process claim should have been included in the order remanding the state claims to the Indiana court. The magistrate judge should not have taken up and resolved the due-process claim as if it arose under federal law—though it was understandable why she did so given the confusion in the pleadings. That claim now returns to state court along with Ogden's other state claims.

With this clarification, the judgment of the district court is AFFIRMED.