NONPRECEDENTIAL DISPOSITION

To be cited only in accordance with Fed. R. App. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Submitted November 20, 2017[*]
Decided November 28, 2017

**Before**

FRANK H. EASTERBROOK, *Circuit Judge*

DANIEL A. MANION, *Circuit Judge*

ILANA DIAMOND ROVNER, *Circuit Judge*

No. 17-1079

| | |
|---|---|
| FREDERICK C. CASHNER, JR., | Appeal from the United States District |
| *Plaintiff-Appellant*, | Court for the Northern District of |
| | Indiana, South Bend Division. |
| *v.* | |
| | No. 3:14-cv-01641 |
| JOHN J. WIDUP, et al., | |
| *Defendants-Appellees*. | Rudy Lozano, |
| | *Judge*. |

### O R D E R

Fredrick Cashner, Jr. asserts that jail medical staff were deliberately indifferent to his serious medical needs, in violation of the Fourteenth Amendment's guarantee of due process, during his pretrial detention. The district court dismissed some claims at screening, *see* 28 U.S.C. § 1915A, and ultimately granted the remaining defendants' motion for summary judgment. We affirm.

---

[*] We have agreed to decide this case without oral argument because the briefs and record adequately present the facts and legal arguments, and oral argument would not significantly aid the court. *See* FED. R. APP. P. 34(a)(2)(C).

We review the facts, taken here from the summary judgment record, in the light most favorable to Cashner. *Ogden v. Atterholt*, 606 F.3d 355, 358 (7th Cir. 2010). While incarcerated at the Porter County Jail from April 2011 to January 2013, Cashner suffered from excruciating headaches so frequently that he was in near-constant contact with the jail's medical unit. At the time, the jail contracted with Advanced Correctional Healthcare to provide medical care at the facility. Dr. Nadir Al-Shami, the jail's primary doctor for the last six months of Cashner's detention, and Kimberly White, the head nurse, were both employees of ACH. John Widup, the final defendant, was the warden of Porter County Jail in charge of overseeing the facility's day-to-day operations, including prisoner medical care.

The district court's summary of Cashner's medical history (which in large part pasted verbatim the summary judgment brief of Dr. Al-Shami and White) provides a day-by-day record of Cashner's treatment and his encounters with medical staff. Relevant to this appeal, the records reveal that Dr. Al-Shami personally examined Cashner six times in six months, and issued telephone orders on seventeen different occasions to assist with Cashner's medical care. Dr. Al-Shami also changed Cashner's medications frequently when they proved ineffective. Widup was not involved in selecting Cashner's medication, but he once met with Cashner to address his complaint about how his medicine was being dispensed. The records also show that in September 2011 Cashner informed a physician at the jail that he had experienced similar headaches ten years earlier resulting from a problem with his cervical spine. Along with his headaches, Cashner suffered from high blood pressure and received additional medication to regulate his condition.

In May 2012, shortly before Dr. Al-Shami became the jail's primary physician, another doctor had ordered a neurological consultation for Cashner. White was in charge of scheduling outside appointments, and she obtained for Cashner the first available appointment on June 28. But Cashner missed his appointment; on that day, the jail was understaffed and another inmate had a medical emergency, forcing staff to cancel Cashner's transport. The appointment was rescheduled for August; in the meantime, Dr. Al-Shami had replaced the previous doctor. Based on Cashner's symptoms, Dr. Al-Shami concluded that a spinal ailment would not explain his condition, and instead diagnosed him with tension-related headaches.[1]  This diagnosis,

---

[1]  After leaving the Porter County Jail, while housed in the Indiana Department of Corrections, Cashner had spinal surgery to fuse three vertebrae.

in Dr. Al-Shami's opinion, rendered the neurological consultation unnecessary, but he did not cancel the appointment, which occurred on August 30. The neurologist, Dr. Vyas, examined Cashner and noted tenderness in his cervical para-spinal muscles. She ordered blood tests and an MRI to assess Cashner's condition, and prescribed Ultram for his pain.

White performed the blood work on September 4, and the results—which became available the next day—were "normal." Cashner attests that on the day of the blood draw, Dr. Al-Shami stormed into the examination room, grabbed Cashner's chart, and began "ranting that he had traveled the world treating patients and he was a better doctor than any neurologist and he wasn't going to let another doctor tell him how to treat a patient of his." Dr. Al-Shami does not deny saying this. He also told Cashner that his condition was "all in his head," that he should take Tylenol from the commissary if he got a headache, and that an MRI was too expensive. Cashner then met with Widup and was told, for the second time, that an MRI was an expensive procedure. But Dr. Al-Shami says that he cancelled the MRI and follow-up appointment with the neurologist after he reviewed Cashner's blood-test results because the normal results solidified his opinion that the headaches were related to Cashner's high blood pressure, thus making an MRI unnecessary. Days later, Cashner again met with Widup because Tylenol had provided no relief from his headaches. Widup contacted Dr. Al-Shami, who prescribed another medication, Topamax, to alleviate Cashner's symptoms.

In October, Cashner got a court order to compel the jail to comply with Dr. Vyas's recommendation. White scheduled another appointment with Dr. Vyas for December 6; on that date, the doctor again prescribed Ultram, added Flexiril, and ordered more blood work and an MRI. Cashner received his medications, and met with Widup to arrange crushing the pills so that he could avoid being housed in the medical isolation unit. But the tests never occurred because Cashner was convicted and transferred to the Indiana Department of Corrections.

Cashner then filed this suit under 42 U.S.C. § 1983 against the defendants for deliberate indifference to his serious medical needs. Cashner alleged that Dr. Al-Shami and White—with support from Widup—unreasonably refused to follow Dr. Vyas's treatment plan in order to save money. Cashner proposed that their deliberate indifference must have originated from a policy of refusing or delaying medical treatment to prisoners for financial reasons, and points to cost-containment provisions in the contract between the jail and ACH to support his theory.

At the screening stage the district court granted Cashner leave to proceed on his claim for deliberate indifference against Dr. Al-Shami, White, and Widup. But the court dismissed Cashner's claims against ACH, concluding that he did not provide a plausible basis to infer that his injuries were caused by an official practice or policy. *See Monell v. Dep't of Soc. Services of City of New York*, 436 U.S. 658 (1978). The court also remarked that a respondeat superior theory of liability does not apply in the context of § 1983 claims. *See Shields v. Ill Dep't of Corr.*, 746 F.3d 782, 790 (7th Cir. 2014). Finally the screening order dismissed "any and all other claims contained in the complaint," presumably referring to Cashner's state-law claims for medical malpractice.

After discovery, the district court entered summary judgment for the remaining defendants. It decided that Cashner did not present sufficient evidence demonstrating that any of the defendants was deliberately indifferent to his needs, for cost-containment reasons or otherwise. In assessing the treatment plan, the court found that Dr. Al-Shami cancelled the MRI only after reviewing Cashner's test results which, in his professional opinion, showed that the procedure was not medically necessary. The court also entered judgment for White and Widup, concluding that Cashner did not demonstrate that these defendants had any role in delaying his neurologist appointments, or that they otherwise acted with deliberate indifference to his medical condition. Upon resolving the § 1983 claims, the judge said he would decline to exercise supplemental jurisdiction over the state medical malpractice claims, though it appears he already dismissed those claims at screening.

A prisoner may establish liability for improper medical care only if he shows that his medical need was objectively serious, and the defendant acted with deliberate indifference to his health or safety. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994); *Petties v. Carter*, 836 F.3d 722, 728 (7th Cir. 2016). Deliberate indifference is a high standard, requiring intent or criminal recklessness in the face of a substantial risk of serious harm. *Farmer*, 511 U.S. at 836–37; *Haywood v. Hathaway*, 842 F.3d 1026, 1031 (7th Cir. 2016). The defendants, appropriately, do not contest that Cashner's headaches qualify as a serious medical need. *See King v. Kramer*, 680 F.3d 1013, 1018 (7th Cir. 2012) (defining an objectively serious medical need as "one that has been diagnosed by a physician as mandating treatment"); *Zentmyer v. Kendall County, Ill.*, 220 F.3d 805, 810 (7th Cir. 2000) (noting that a minor ailment may evolve into a serious medical need where the prisoner received inadequate treatment for "almost a month"); *Gutierrez v. Peters*, 111 F.3d 1364, 1373 (7th Cir. 1997) (classifying chronic pain as an indicator of a serious medical injury). But Cashner has not raised a genuine issue of material fact regarding whether any of the defendants was deliberately indifferent to his condition.

Cashner accuses Dr. Al-Shami of being deliberately indifferent to his headaches because the doctor made some unprofessional comments before cancelling the MRI and follow-up appointment with the neurologist. Cashner thus surmises that Dr. Al-Shami amended his treatment plan "based upon spite rather than medical judgment." But any alleged rant is immaterial to Cashner's claim because verbal harassment, albeit unprofessional, generally does not violate a prisoner's constitutional rights. *Beal v. Foster*, 803 F.3d 356, 358 (7th Cir. 2015). And Dr. Al-Shami's remarks do not evidence any failure to exercise proper medical judgment in Cashner's treatment; Dr. Al-Shami expressed from his first day of treating Cashner that a neurological consultation was not needed because, in his—genuine, as far as the record shows—medical opinion, the headaches could be explained by high blood pressure and tension. *See Cesal v. Moats*, 851 F.3d 714, 724 (7th Cir. 2017) (finding deliberate indifference when doctor strayed from accepted professional standards); *Greeno v. Daley*, 414 F.3d 645, 655 (7th Cir. 2005).

Dr. Al-Shami was diligent in his care of Cashner both before and after the first neurologist appointment. During six months of treatment, Cashner was personally examined by Dr. Al-Shami on six separate occasions and benefitted from seventeen telephone orders providing for additional medical treatment. Dr. Al-Shami also prescribed a wide variety of medications aimed at regulating Cashner's health problems and eliminating the associated headache pain. *Gutierrez v. Peters*, 111 F.3d 1364, 1374 (7th Cir. 1997) (emphasizing the "detailed account of the treatment he received" in rejecting deliberate indifference finding). When Cashner complained that certain medications were not working, Dr. Al-Shami timely prescribed an alternative medication, leading to frequent changes in the treatment plan. *See Rodriguez v. Plymouth Ambulance Service*, 577 F.3d 816, 829 (7th Cir. 2009) (delaying treatment of medical condition may support Eighth Amendment claim). And often the modifications succeeded in providing Cashner with relief from his headaches for days, and sometimes weeks, at a time. Even though Dr. Al-Shami said on the day of the blood test that he would no longer treat Cashner, he prescribed medication two days later and continued to provide medical care, including examinations and many other prescriptions, during Cashner's remaining four months of incarceration at the jail. *See Duckworth v. Ahmad*, 532 F.3d 675, 679–80 (7th Cir. 2008) (stating "if this comes back clear, I don't want to hear no more out of you" did not evidence deliberate indifference when doctor continued to provide care to prisoner). This level of continuous treatment would not constitute even negligence, let alone deliberate indifference.

The same is true with respect to Cashner's argument that Dr. Al-Shami displayed deliberate indifference when he canceled Cashner's MRI and his follow-up appointment with the specialist. A disagreement between doctors over a treatment plan does not establish that one has diverged from the standard of care. *Estate of Cole v. Fromm*, 94 F.3d 254, 261 (7th Cir. 1996). Cashner may not agree with Dr. Al-Shami's treatment, but he has not pointed to any evidence showing that his decisions were "so far afield of accepted professional standards" that a jury could find they were not the product of medical judgment. *Cesal*, 851 F.3d at 724 (quoting *Duckworth*, 532 F.3d at 679); *Arnett v. v. Webster*, 658 F.3d 742, 754 (7th Cir. 2011) ("[A]n inmate is not entitled to demand specific care."). Indeed, Cashner did not adduce any evidence establishing the reasonable standard of care he accuses Dr. Al-Shami of violating.

As for Cashner's claims against White and Widup, we again find no reason to disturb the district court's judgment. Cashner accuses both defendants of conspiring to delay his medical treatment for financial reasons. Because the jail was financially responsible for off-site medical care, he believes that the defendants must have cancelled two of his neurologist appointments (the initial one scheduled for June 28 and the one that was to come after an MRI), as well as the recommended testing, to avoid the cost. But White and Widup did not cancel either appointment. His transport to the first appointment was cancelled because the jail was short-staffed and another prisoner was experiencing a medical emergency. And the record shows that Dr. Al-Shami, without input from White or Widup, had the MRI and follow-up appointment cancelled.

White acted appropriately in administering Cashner's medical treatment. As a nurse, White is expected to defer to the treating physician's instructions. *See Berry v. Peterman*, 604 F.3d 435, 443 (7th Cir. 2010). True, this standard does not absolve nurse practitioners of their independent duty to ensure that a prisoner receives constitutionally adequate care, for example, when "it is apparent that the physician's order will likely harm the patient." *Berry*, 604 F.3d at 443; *Perez v. Fenoglio*, 792 F.3d 768, 779 (7th Cir. 2015). But Cashner has not presented any evidence showing that White had reason to doubt Dr. Al-Shami's treatment plan, and—considering Dr. Al-Shami was diligent in his care for Cashner—no conceivable reason existed for White to question the attending physician's orders.

We also find no evidence of deliberate indifference in Widup's involvement with Cashner's care. Non-medical defendants, like Widup, can rely on the expertise of medical personnel, *Arnett*, 658 F.3d at 755; *McGee v. Adams*, 721 F.3d 474, 483 (7th Cir.

2013), unless they have "reason to believe (or actual knowledge) that prison doctors or their assistants are mistreating (or not treating) a prisoner." *Hayes v. Snyder*, 546 F.3d 516, 527 (7th Cir. 2008) (quoting *Spruill v. Gillis*, 372 F.3d 218, 236 (3d Cir. 2004)). Widup had four sporadic interactions with Cashner about his medical care. In all four instances, Widup did not "ignore [Cashner's] plight." *Arnett*, 658 F.3d at 755. To the contrary, he made accommodations for Cashner to better implement the medical staff's treatment plan. *See id.* at 756 (impeding medical staff's ability to provide effective treatment may constitute deliberate indifference). Although on one occasion Widup remarked to Cashner that MRIs are expensive, Cashner has no evidence that Widup had any role in cancelling the MRI appointment; the decision was left to Dr. Al-Shami, and under the circumstances Widup was free to rely on the expertise of the treating physician without incurring liability. *Berry*, 604 F.3d at 440.

Cashner also argues on appeal that the district court erred in dismissing ACH as a defendant during screening, *see* 28 U.S.C. § 1915A. A private corporation is shielded from vicarious liability in actions brought under § 1983, unless, like ACH, it is effectively a state actor and the plaintiff can demonstrate that the wrongdoers acted pursuant to an unconstitutional policy or custom. *Whiting v. Wexford Health Sources, Inc.*, 839 F.3d 658, 664 (7th Cir. 2016); *Shields v. Ill Dep't of Corr.*, 746 F.3d 782, 790 (7th Cir. 2014); *Perez*, 792 F.3d at 780 & n.5.

Cashner alleged in his complaint that ACH created "a policy to refuse and/or delay treatment to save money." But the court concluded, appropriately, that these "few words on paper"—the only words about ACH's supposed wrongdoing—were insufficient to state a plausible *Monell* claim. *Swanson v. Citibank, N.A.*, 614 F.3d 400, 403 (7th Cir. 2010). On appeal, Cashner fixates on provisions in the jail's contract with ACH that limit the company's financial responsibility for certain medical services, including appointments with outside providers. But even though we construe Cashner's allegations liberally, *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (per curiam), simply pointing to unremarkable cost-sharing and cost-containment provisions is not enough to render it plausible that ACH had an official policy to refuse or delay medical treatment to prisoners. Moreover, the contract was not before the court at the screening stage; all the court had was the conclusory allegation about a policy. In any event, the contract tends to disprove Cashner's theory because the jail—not ACH—would have been responsible for the cost of Cashner's off-site care. Because Cashner has not presented a plausible claim against ACH, dismissal was appropriate. *Swanson*, 614 F.3d at 404.

AFFIRMED.