Matt MAGALIS, Plaintiff,

v.

Carol ADAMS, Jerome Butler,
Elizabeth Gil, and Matt
Ryan, Defendants.

No. 08–CV–3135.

United States District Court,
C.D. Illinois,
Urbana Division.

July 16, 2012.

Carl R. Draper, Feldman, Wasser, Draper & Cox, Springfield, IL, for Plaintiff.

Thomas Bradley, Joseph M. Gagliardo, Laner, Muchin, Dombrow, Becker, Levin & Tominberg, Chicago, IL, for Defendant.

## OPINION

MICHAEL P. McCUSKEY, District Judge.

This case is before the court for ruling on the Motion for Summary Judgment (# 62) filed by Defendants Carol Adams, Jerome Butler, Elizabeth Gil,[1] and Matt Ryan. Following this court's careful and thorough review of the arguments of the parties and the documents filed by the parties, Defendants' Motion for Summary Judgment (# 62) is GRANTED.

## FACTS [2]

Plaintiff, Matt Magalis, began working for the State of Illinois in 1993. In 2006, Plaintiff worked for the Illinois Department of Human Services (DHS) in the Office of Clinical, Administrative and Program Support (OCAPS). James Hobbs, the Manager of OCAPS, was Plaintiff's supervisor in 2006. Plaintiff testified that Hobbs called him into his office in late September or early October 2006 and showed him the Final Report the Office of the Executive Inspector General (OEIG) had prepared regarding Khalil Shalabi, an employee of DHS on administrative leave. Plaintiff was aware that Shalabi was being investigated because OEIG investigators had seized Shalabi's computer. Plaintiff testified that Hobbs showed him excerpts from the OEIG Report which stated that Shalabi conducted personal and political business while on the job for DHS.[3]

Shalabi had been hired by DHS in 2003. During his deposition, Hobbs testified that Teyonda Wertz, deputy secretary for DHS, told him to evaluate Shalabi for a position with DHS. Hobbs stated that, when Shalabi came to meet with him, Shalabi told him he was sent over by the Governor's office. Hobbs testified that he was told by human resources to hire Shalabi for a position with DHS. Hobbs testified that, after the OEIG Report regarding Shalabi was completed, he was informed that Wertz was handling the matter. Hobbs testified that he gave his copy of the OEIG Report to Gayle Jones, his administrative assistant, and told her to "mark it or stamp it confidential and lock it up." Jones testified that the OEIG Report was not in an envelope marked "Confidential" when she received the report and gave it to Hobbs. Jones confirmed that Hobbs told her to "[l]ock this up." She testified that she put the OEIG Report in an envelope, stamped it confidential, sealed it, put it in the file cabinet and locked the cabinet.

Around October 15, 2006, Plaintiff was working and needed a red felt tip pen. Office supplies were located in a locked

---

1. Defendant Gil's name is now Sarmiento. To avoid confusion, this court will continue to refer to her as "Gil."

2. This court's recitation of the facts is based on Defendants' Statement of Undisputed Material Facts, Plaintiff's Statement of Additional Material Facts and the documents submitted by the parties, including deposition transcripts and the transcript from the hearing before the Civil Service Commission. This court notes that Plaintiff's Statement of Additional Material Facts was unnecessarily difficult to follow. Plaintiff's statement of facts did not follow any logical sequence and did not identify the non-parties discussed or explain their potential significance. Plaintiff also omitted citations to the record for some of the listed facts and made references to documents which were not provided to this court in other listed facts. This confusing presentation was not helpful to his cause. In any event, this court has only included facts that are material to the issues in this case and are supported by the documentation included in the record.

3. Hobbs testified that he did not recall discussing the OEIG Report with Plaintiff.

lateral file cabinet down the hallway from Plaintiff's office. Jones had the key for the cabinet in her desk drawer. Plaintiff requested a red pen from Jones and she replied that she did not have one, but she handed her cabinet key to Plaintiff so that he could retrieve a red pen from the cabinet. After unlocking and opening the cabinet, Plaintiff saw a 9″ × 12″ manila envelope with "CONFIDENTIAL" stamped in red letters on it. Plaintiff left the envelope in the cabinet, closed and locked the cabinet and returned the key to Jones.

Plaintiff then deliberately waited for Jones to leave for the day. After Jones left, Plaintiff opened Jones' desk drawer and removed the key to the file cabinet. Plaintiff testified at his deposition that the keys in Jones' desk were available to several employees, including Plaintiff, without the need to seek permission. Plaintiff then unlocked the file cabinet, took and opened the envelope marked "CONFIDENTIAL" and removed the contents of the envelope, which was the OEIG Report regarding Shalabi. Plaintiff made a photocopy of the OEIG Report and its cover letter. Plaintiff then returned the OEIG Report to the envelope, returned the envelope to the cabinet, relocked the cabinet, returned the key to Jones' desk drawer, and left the office. After Plaintiff arrived home that evening, he read the OEIG Report, including the cover letter. It is undisputed that the cover letter included a boxed statement that read as follows:

> As required under the State Officials and Employees Ethics Act ("Ethics Act"), this summary report is submitted to the Agency Director and the Illinois Governor or his designee. This report and any attachments are CONFIDENTIAL and are not subject to the Freedom of Information Act pursuant to the Ethics Act. The report and attachments may be disclosed only on a need-to-know basis to those persons the Director has deemed necessary. Neither this report nor any information contained therein may be shared with anyone outside of the affected agency or the Governor, or his designee, without the express permission of the Executive Inspector General. To the extent that this report contains any information identifying the complainant, it must be removed prior to any dissemination beyond these intended recipients.

After reading the OEIG Report, Plaintiff faxed a copy of it to Christi Parsons, a reporter for the Chicago Tribune. The Chicago Tribune subsequently published a story which included details from the OEIG Report regarding Shalabi. Plaintiff also provided a copy of the OEIG Report to his attorney. Plaintiff never sought authorization or received permission to share the OEIG Report with anyone. Plaintiff testified that he leaked the OEIG Report because he wanted the public to know about it and because he wanted the FBI to investigate it.

After the article about the Shalabi OEIG Report appeared in the Chicago Tribune, the OEIG conducted an investigation to determine who had sent the OEIG Report to the Chicago Tribune. Investigators interviewed Hobbs several times, including an interview at his home, and Hobbs testified that the investigators thought he was responsible. When Plaintiff was interviewed during the course of the OEIG investigation, he admitted what he had done concerning the OEIG Report.

Plaintiff was scheduled for a pre-disciplinary hearing on December 6, 2006. Hobbs testified that an OEIG Report regarding Plaintiff came out one week to ten days before that. Hobbs stated that he and Jerome Butler, DHS's Chief of Staff,[4]

---

**4.** Some of the witnesses identified Butler as DHS's Chief of Staff. However, Gil testified

that Butler was DHS's Chief Operating Offi-

were involved in a discussion regarding potential discipline for Plaintiff. Hobbs testified that Butler contacted him the day before the pre-disciplinary hearing and told him to cancel the hearing. Plaintiff was then transferred to business services and continued working for DHS. Hobbs no longer supervised Plaintiff after his transfer.

The findings of the OEIG Report concerning Shalabi were publically disclosed in December 2006. The documentation shows that Shalabi was suspended pending discharge on December 6, 2006, and was discharged for cause on December 28, 2006. The written charges against Shalabi stated that, throughout Shalabi's employment with DHS, while on State time, Shalabi engaged in activities related to his personal businesses. The written charges also stated that Shalabi, using his State-owned computer, engaged in prohibited political activity for the Friends of Blagojevich committee and engaged in fundraising for Governor Rod Blagojevich.

Defendant Adams was the Secretary of DHS from 2003 to 2009. Adams testified that she recalled meeting with Butler about Plaintiff's conduct, which she stated was that Plaintiff "had gone into some file or another, gotten out a confidential report about Shalabi's OEIG investigation and sent it to the press." Adams also testified that she had a discussion about terminating Plaintiff's employment with Butler and Wertz after the OEIG Report regarding Plaintiff was received. Adams testified that, after the meeting, the direction was to move to termination, depending upon what type of employee Plaintiff was. Adams also testified that she agreed with the recommendation in the OEIG Report that Plaintiff's employment should be ter-

minated and ultimately approved Plaintiff's discharge.

Defendant Gil is the Director of Human Resources for DHS. She testified that she made the recommendation on behalf of DHS to terminate Plaintiff's employment. She stated that this recommendation was made in 2006. At her deposition, Gil testified that she "became aware that [Plaintiff] took a confidential document and shared it with the media" and that she thought this conduct was "serious." She testified that she thought "wow, how can someone do that."

Defendant Ryan testified that he was employed as Deputy General Counsel from June 2004 to August 15, 2007, which was during Governor Blagojevich's time in office. Ryan testified that he was responsible for managing litigation brought against the Governor and agencies under the Governor's jurisdiction. Ryan testified that he was also responsible for the Governor's office's responses to Freedom of Information Act requests, oversaw the office of General Counsel review of clemency petitions, provided counsel on legislative matters, and viewed reports from the OEIG related to alleged misconduct in the office and the agencies under the jurisdiction of the Governor. Ryan testified that, after viewing the OEIG reports, he provided a recommendation to the office of the Governor on the position that the office ought to take on individual reports. This recommendation was sometimes communicated to the Governor's chief of staff, who was Lon Monk and then John Harris during Ryan's employment. Ryan testified that he then communicated to the agency involved the Governor's office's position on what appropriate action, if any, ought to be taken. Ryan testified that he had no rea-

cer and Wertz was Chief of Staff. This court concludes it is not necessary to resolve this conflict. For purposes of this Opinion, this court will refer to Butler as Chief of Staff and Wertz as deputy secretary of DHS.

son to believe that the Governor's office did not concur with the recommendation in the OEIG Report that Shalabi's employment should be terminated. Ryan testified that he learned that the OEIG was investigating the leak of the Shalabi report and that he received the OEIG Report regarding Plaintiff. Ryan testified that he met with DHS staff regarding Plaintiff at the Governor's office. Ryan testified that Butler was present at the meeting. Ryan testified that he communicated to DHS that the position of the Governor's office was that the discipline recommended in the OEIG Report was warranted by Plaintiff's conduct.

While the other Defendants in this case testified regarding Butler's participation in meetings and other aspects of the decision to terminate Plaintiff's employment, Butler testified that he did not participate in any meetings regarding Plaintiff's termination. Butler also testified that it was not, to his knowledge, regular or customary for someone from the Governor's office to be involved in employment termination decisions.

Adams testified that the normal "turnaround" on a recommendation by the OEIG was 30 days. However, Hobbs testified that "[i]t's not unusual for investigations and reviews of very serious matters to take many months, four, five, six, seven months." On October 10, 2007, the Director of Central Management Services (CMS) approved written charges for Plaintiff's discharge. The written Statement of Charges set forth five separate grounds for terminating Plaintiff's employment: (1) violation of the confidentiality provisions of the Ethics Act; (2) violation of DHS's policy prohibiting theft of State property; (3) violation of DHS's policy on keys and locks; (4) violation of DHS's administrative directive regarding press communications; and (5) conduct unbecoming a State and DHS employee. The written charges

stated that the Ethics Act was violated by Plaintiff's conduct because his conduct "resulted in the disclosure of the identification of individuals providing information to the OEIG" regarding the investigation of Shalabi. Plaintiff's employment was terminated on October 15, 2007. Gil testified that she did not know why it took so long to terminate Plaintiff's employment. Adams also testified that she did not know why the termination process was delayed.

After his discharge, Plaintiff submitted a written request for a hearing before the Civil Service Commission. The hearing was held on November 27, 2007 and January 4, 2008. At the hearing, it was stipulated that 13 DHS employees (including Plaintiff) had received or had seen a copy of the Shalabi OEIG Report on or before October 16, 2006. On May 2, 2008, Administrative Law Judge Daniel Stralka issued his Findings of Fact, Conclusions of Law and Recommended Decision. ALJ Stralka found Charges No. 1, 2, 3, and 5 proven and Charge No. 4 not proven. On May 16, 2008, in a 5–0 vote, the Commission approved the recommended decision to uphold Plaintiff's discharge. The Commission stated:

> To clarify the findings of fact adopted by the Commission, it is hereby found that the Respondent surreptitiously acquired the key to the locked file cabinet where the confidential Office of Executive Inspector General Final Report was kept in an envelope clearly stamped "CONFIDENTIAL" in red. He took the Report and copied it before returning it to the file cabinet so no one would know of his actions. Knowing he was in possession of a confidential document, he proceeded to violate the confidentiality by providing a copy to his attorney and a newspaper. He was not authorized to take any of these actions, never sought authorization for any of these actions nor did he notify anyone at the Department of Hu-

man Services of what he had done. It is also found that Magalis was not acting in the capacity of an Agency employee when he transmitted the Report to the newspaper. Accordingly, it is hereby determined that the written charges for discharge approved by the Director of the Illinois Department of Central Management Services have been partially proven, and do warrant discharge for the reasons set forth in the recommended decision including the seriousness of the charges, the deceitful nature of his conduct, the knowing violation of Agency rules and the statutory confidentiality afforded the Report, the chilling effect his misconduct may have on potential complainants under the State Officials and Employees Ethics Act, and the disruption to the Agency. Discharge is warranted despite his performance record, lack of prior discipline and 14 years of continuous service. In addition, any one of the proven charges standing alone is sufficient to warrant the discharge of Respondent.

## PROCEDURAL HISTORY

On May 19, 2008, Plaintiff filed a two-count Complaint in the circuit court of Sangamon County. In Count I, Plaintiff sought administrative review of the Commission's decision. In Count II, Plaintiff sought relief under 42 U.S.C. § 1983 for an alleged violation of his rights under the First Amendment of the United States Constitution. Plaintiff alleged that there "existed a common plan or scheme" among Defendants and Governor Blagojevich "to terminate State employees perceived as being political opponents of the new administration and to further create employment opportunities for political supporters of Governor Blagojevich." Plaintiff al-

leged that, in furtherance of that "scheme," Defendants terminated Plaintiff's employment in retaliation for his disclosure of the Shalabi OEIG Report to the press. Plaintiff sued Defendants Adams, Butler, Gil, and Ryan in their individual capacities. Defendant Adams was also "sued in her official capacity for the matters concerning injunctive and declaratory relief." Plaintiff sought compensatory damages and also asked the court to grant "a permanent injunction prohibiting defendants from removing Plaintiff from his employment and ordering him reinstated in employment with full restoration of seniority, credit for continuous service, and restoration of all pension, insurance or other benefits of employment." On June 16, 2008, Defendants removed the Complaint to the Central District of Illinois. The case was assigned to United States District Judge Jeanne E. Scott.

On September 10, 2008, 2008 WL 4211662, Judge Scott entered an Opinion (# 12). Judge Scott dismissed various Defendants and remanded Count I to state court.[5] Count II proceeded against the remaining Defendants: Adams, Butler, Gil and Ryan. In their Motion for Summary Judgment, Defendants correctly noted that the Illinois Department of Human Services and the Illinois Civil Service Commission are incorrectly listed as active Defendants in this court's docket. The clerk is therefore directed to terminate the Illinois Department of Human Services and the Illinois Civil Service Commission as Defendants in this action pursuant to Judge Scott's Opinion (# 12).

On July 29, 2010, this case was assigned to this court due to Judge Scott's retirement. On February 15, 2011, Defendants filed a Motion for Summary Judgment

---

**5.** The records of the circuit court of Sangamon County show that Plaintiff's request for administrative review of the Commission's de-

cision was fully briefed as of August 16, 2010, and remains pending.

(# 62) and a Memorandum in Support (# 63) with attached exhibits. On March 29, 2011, this court allowed Plaintiff additional time to conduct depositions. This court also allowed Defendants until July 15, 2011, to file an amended motion for summary judgment. On May 13, 2011, this case was assigned to United States District Judge Sue E. Myerscough.

On July 15, 2011, Defendants filed an Amended Memorandum of Law in Support of their Motion for Summary Judgment (# 70) with attached exhibits. On August 17, 2011, Plaintiff filed a Response to Motion for Summary Judgment (# 72) with supporting exhibits. On August 31, 2011, Defendants filed their Reply (# 73). On April 4, 2012, Judge Myerscough disqualified herself and recused herself from participation in this matter. This case was once again assigned to this court.

## ANALYSIS

### I. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In ruling on a motion for summary judgment, a district court "has one task and one task only: to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." *Waldridge v. Am. Hoechst Corp.,* 24 F.3d 918, 920 (7th Cir.1994). In making this determination, the court must construe the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in favor of that party. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Singer v. Raemisch,* 593 F.3d 529, 533 (7th Cir.2010). However, a court's favor toward the nonmoving party does not extend to drawing inferences which are only supported by speculation or conjecture. *See Singer,* 593 F.3d at 533.

The party opposing summary judgment may not rely on the allegations contained in the pleadings. *Waldridge,* 24 F.3d at 920. "[I]nstead, the nonmovant must present definite, competent evidence in rebuttal." *Butts v. Aurora Health Care, Inc.,* 387 F.3d 921, 924 (7th Cir.2004). Summary judgment "is the 'put up or shut up' moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events." *Koszola v. Bd. of Educ. of City of Chicago,* 385 F.3d 1104, 1111 (7th Cir. 2004), *quoting Johnson v. Cambridge Indus., Inc.,* 325 F.3d 892, 901 (7th Cir.2003). Specifically, to survive summary judgment, the nonmoving party "must make a sufficient showing of evidence for each essential element of its case on which it bears the burden at trial." *Kampmier v. Emeritus Corp.,* 472 F.3d 930, 936 (7th Cir.2007), *citing Celotex Corp.,* 477 U.S. at 322–23, 106 S.Ct. 2548. Conclusory allegations not supported by the record are not enough to withstand summary judgment. *See Basith v. Cook County,* 241 F.3d 919, 928 (7th Cir.2001).

### II. DEFENDANTS' MOTION

In their Motion for Summary Judgment, Defendants argue that they are entitled to summary judgment on Plaintiff's claims because: (1) Plaintiff was terminated for misconduct and not in retaliation for the exercise of his First Amendment rights; (2) even if Plaintiff's conduct could be considered "speech," Plaintiff's speech was not protected under *Pickering v. Bd. of Educ.,* 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968); and (3) even if the *Pickering* balance was found to fall in Plaintiff's favor, Defendants are entitled to qualified immu-

984

nity regarding Plaintiff's claims. Plaintiff insists that there are genuine disputes of material fact which preclude summary judgment in favor of Defendants and that Defendants are not entitled to qualified immunity because Plaintiff is seeking injunctive relief.

## A. FIRST AMENDMENT CLAIM

■ Plaintiff's First Amendment retaliation claim requires Plaintiff to show that: (1) he engaged in activity protected by the First Amendment; (2) he suffered an adverse action that would likely deter future First Amendment activity; and (3) the First Amendment activity was "at least a motivating factor" in the defendants' decision to retaliate. *Santana v. Cook County Bd. of Review,* 679 F.3d 614, 622 (7th Cir.2012), *quoting Bridges v. Gilbert,* 557 F.3d 541, 546 (7th Cir.2009); *see also Valentino v. Vill. of S. Chicago Heights,* 575 F.3d 664, 670 (7th Cir.2009). In order to establish this prima facie case, "the plaintiff must produce evidence that his speech was at least a motivating factor—or, in philosophical terms, a 'sufficient condition'—of the employer's decision to take retaliatory action against him." *Kidwell v. Eisenhauer,* 679 F.3d 957, 965 (7th Cir. 2012), *citing Greene v. Doruff,* 660 F.3d 975, 979–80 (7th Cir.2011).

■ If the plaintiff establishes a prima facie case, the burden shifts to the employer to rebut the causal inference raised by the plaintiff's evidence. *Kidwell,* 679 F.3d at 965. The defendant can rebut the plaintiff's prima facie case by establishing that the plaintiff's protected conduct "was not a but-for or 'necessary condition' of the harm, i.e., that the harm would have occurred anyway." *Surita v. Hyde,* 665 F.3d 860, 874 (7th Cir.2011), *quoting Greene,* 660 F.3d at 979.

■ In analyzing a First Amendment retaliation claim arising under § 1983, this court must first determine whether Plain-

tiff's speech was constitutionally protected. *Doyle v. Chief Judge of the Tenth Judicial Circuit,* 2007 WL 2572387, at *4 (C.D.Ill. 2007), *citing Sigsworth v. City of Aurora, Ill.,* 487 F.3d 506, 509 (7th Cir.2007). It is well settled that Plaintiff, as a public employee, did not relinquish all First Amendment rights because he worked for the government. *See Valentino,* 575 F.3d at 671. Public employees remain citizens, "and as such, '[t]he First Amendment limits the ability of a public employer to leverage the employment relationship to restrict, incidentally or intentionally, the liberties employees enjoy in their capacities as private citizens.'" *Ogden v. Atterholt,* 606 F.3d 355, 358 (7th Cir.2010), *quoting Garcetti v. Ceballos,* 547 U.S. 410, 419, 126 S.Ct. 1951, 164 L.Ed.2d 689 (2006). "Accordingly, '[s]o long as employees are speaking as citizens about matters of public concern, they must face only those speech restrictions that are necessary for their employers to operate efficiently and effectively.'" *Ogden,* 606 F.3d at 358, *quoting Garcetti,* 547 U.S. at 419, 126 S.Ct. 1951.

## B. MISCONDUCT

■ Defendants first argue that Plaintiff's actions constituted misconduct and not protected speech. Defendants argue that Plaintiff's "surreptitious pilfering" was not speech. Defendants contend that Plaintiff's testimony, standing alone, proves the nature of the misconduct at issue because he admitted that he: (1) surreptitiously acquired the key to the locked file cabinet; (2) took the envelope stamped "CONFIDENTIAL;" (3) took the OEIG Report out of the envelope, including the cover letter stating that it was confidential and not to be shared, and copied it before returning it so that no one would know what he did; and (4) sent the report to the Chicago Tribune and his attorney, even though he know the OEIG

Report was confidential. Further, Plaintiff admitted he did not seek authorization for his actions. Defendants argue that Plaintiff's conduct involved a serious breach of trust and ethics.

Under the State Officials and Ethics Act (Ethics Act), five independent Offices of the Executive Inspector General were created "one each for the Governor, the Attorney General, the Secretary of State, the Comptroller, and the Treasurer." 5 Ill. Comp. Stat. 430/20–10(a) (West 2010) (originally effective December 9, 2003). Under the Ethics Act, each OEIG acts as an independent agency whose function is "to investigate allegations of fraud, waste, abuse, mismanagement, misconduct, nonfeasance, misfeasance, malfeasance, or violations of this Act or violations of other related laws and rules." 5 Ill. Comp. Stat. 430/20–10(c) (West 2010). By statute, if an OEIG, "upon the conclusion of an investigation, determines that reasonable cause exists to believe that a violation has occurred, then the [OEIG] shall issue a summary report of the investigation." 5 Ill. Comp. Stat. 430/20–50(a) (West 2010). The Ethics Act includes a "Confidentiality" provision which states that the "identity of any individual providing information or reporting any possible or alleged misconduct" to an OEIG "shall be kept confidential and may not be disclosed without the consent of that individual." 5 Ill. Comp. Stat. 430/20–90(a).[6] The Ethics Act also provides:

> Unless otherwise provided in this Act, all investigatory files and reports of the Office of an Executive Inspector General, other than monthly reports required under Section 20–85, are confidential, are exempt from disclosure under the Freedom of Information Act, and shall not be divulged to any person or agency, except as necessary (i) to a law enforcement authority, (ii) to the ultimate jurisdictional authority, (iii) to the Executive Ethics Commission, [or] (iv) to another Inspector General appointed pursuant to this Act.

5 Ill. Comp. Stat. 430/20–95(d). The Ethics Act also provides that a State employee who intentionally violates Section 20–90 "is subject to discipline or discharge by the appropriate ultimate jurisdictional authority." 5 Ill. Comp. Stat. 430/50–5(f) (West 2010).

Defendants have pointed out that the statutory requirement that State employees maintain the confidentiality of OEIG reports is also apparent on the face of every report generated by the OEIG. It is undisputed that the cover letter of the Shalabi OEIG Report stated that "[t]his report and any attachments are CONFIDENTIAL and are not subject to the Freedom of Information Act pursuant to the Ethics Act." The cover letter also stated that "[n]either this report nor any information contained therein may be shared with anyone outside of the affected agency or the Governor, or his designee, without the express permission of the Executive Inspector General." In addition, it stated that "[t]o the extent that this report contains any information identifying the complainant, it must be removed prior to any

---

**6.** Plaintiff has argued that this provision applies only to commissioners and employees of the Executive Ethics Commission and employees working for the OEIG based upon 5 Ill. Comp. Stat. 430/20–90(e). No such subsection exists and this court assumes that Plaintiff is actually referring to 5 Ill. Comp. Stat. 430/20–90(b). In any case, this court agrees with ALJ Stralka that this argument ignores the penalties section, 5 Ill. Comp. Stat. 430/50–5(f), which refers to a "State employee" violating these sections. This court further concludes that, read with the other pertinent sections of the Ethics Act, it is clear that this information is meant to be kept confidential by all State employees, including Plaintiff.

dissemination beyond these intended recipients."

Plaintiff has pointed out that the Ethics Act was amended, effective August 18, 2009, and now provides:

> Within 60 days after receipt of a summary report and response from the ultimate jurisdictional authority or agency head that resulted in a suspension of at least 3 days or termination of employment, the Executive Ethics Commission shall make available to the public the report and response or a redacted version of the report and response.

5 Ill. Comp. Stat. 430/20–52(a) (West 2010). The statute also provides that the Commission "shall redact information in the summary report that may reveal the identity of witnesses, complainants, or informants or if the Commission determines that it is appropriate to protect the identity of a person before the report is made public." 5 Ill. Comp. Stat. 430/20–52(b) (West 2010). This court agrees with Defendants that this amendment to the Ethics Act has no bearing on this case. First, it was not in effect at the time of Plaintiff's actions in 2006. Second, even if it had been in effect, it would not have applied to Plaintiff's actions. The statute concerns the Commission's obligation to make re-ports available to the public in certain circumstances and also provides that the Commission "shall" redact confidential information from the reports. This statute did not and could not justify Plaintiff's unauthorized decision to make an unredacted report public. Based upon this court's careful review of the pertinent provisions of the Ethics Act, this court concludes that Plaintiff's conduct clearly vio-lated the confidentiality requirements of the Ethics Act.

Plaintiff has argued, however, that terminating his employment based upon his conduct violated the "whistleblower" provision of the Personnel Code.[7] The statute cited by Plaintiff provides:

> (1) In any case involving any disclosure of information by an employee which the employee reasonably believes evidences—
>
> (i) a violation of any law, rule, or regulation; or
>
> (ii) mismanagement, a gross waste of funds, an abuse of authority, or a substantial and specific danger to public health or safety if the disclosure is not specifically prohibited by law, the identity of the employee may not be disclosed without the consent of the employee during any investigation of the information and any related matters.
>
> (2) No disciplinary action shall be taken against any employee for disclosure of any alleged prohibited activity under investigation or for any related activity.

20 Ill. Comp. Stat. 415/19c.1 (West 2010). This court agrees with Defendants that this statute does not apply to Plaintiff's conduct. The purpose of this provision is to protect state employees from retaliatory action in order "to advance the Personnel Code's central purpose of advancing the interest of the state and the public by encouraging state employees who become aware of wrongdoing by other state employees to report the wrongdoing." *Metzger v. DaRosa*, 209 Ill.2d 30, 282 Ill.Dec. 148, 805 N.E.2d 1165, 1169 (2004). In this

---

7. This court notes that the Illinois Supreme Court has held that there is no private right of action under this statute. *Metzger v. DaRosa*, 209 Ill.2d 30, 282 Ill.Dec. 148, 805 N.E.2d 1165, 1173 (2004). Therefore, Plaintiff cannot have a cause of action based upon an alleged violation of the statute. This court therefore considers Plaintiff's argument regarding the statute as an assertion that his conduct was not misconduct but rather was whistleblowing so that it was protected speech under the First Amendment. This court does not find Plaintiff's argument persuasive.

case, Plaintiff did not become aware of Shalabi's wrongdoing and report it. Instead, Shalabi's wrongdoing was reported by others and an investigation was conducted and concluded with an OEIG Report. Plaintiff surreptitiously obtained a copy of the Report and provided it to a newspaper reporter, in violation of the Ethics Act. Plaintiff contends that his speech "not only brought to light the initial wrongdoing on the part of Shalabi, but he also uncovered an ongoing government coverup." Plaintiff argued that his speech "therefore showcased two incidents of prohibited activity: both Shalabi's actions while working for the state, and the state's actions of keeping him employed and covering up the first incident of corruption." This court agrees with Defendants that the problem with Plaintiff's argument is there is no evidence that Plaintiff "uncovered an ongoing government coverup." The only evidence which supports Plaintiff's argument is the fact that Shalabi was not fired immediately after the OEIG Report was completed. The evidence shows that the Report was completed in late September or early October 2006. Shalabi was suspended pending discharge on December 6, 2006, and was discharged for cause on December 28, 2006. This evidence falls far short of showing that the state was keeping Shalabi employed and covering up Shalabi's conduct. This court has no doubt that Plaintiff sincerely believes that the Shalabi situation was not handled properly. He has provided this court with no evidence that was the case, however. Shalabi's discharge occurred within a reasonable time after the OEIG Report recommending his termination was completed. In fact, Shalabi was terminated less than three months after the OEIG Report, which was actually much quicker than Plaintiff's own termination. This court concludes that Plaintiff has provided no evidence to substantiate his theory. *See*

*Moss v. Martin,* 614 F.3d 707, 710 (7th Cir.2010).

Following this discussion of the statutes cited by the parties, this court concludes that Plaintiff's conduct violated the Ethics Act and was not protected under the cited provision of the Personnel Code. However, in arguing that Plaintiff engaged in misconduct and not protected speech, Defendants have relied on *Doyle* and cases from other circuits. After careful review of the cited cases, this court concludes that the courts actually engaged in a balancing of the plaintiffs' conduct and the interests of the employers before concluding that the plaintiffs involved did not have a viable retaliation claim. *See Doyle,* 2007 WL 2572387, at *7 (after thorough analysis of the applicable balancing test, court concluded that the plaintiff failed to establish that his disclosure of confidential information was constitutionally protected speech); *Douglas v. DynMcDermott Petroleum Operations Co.,* 144 F.3d 364, 372–77 (5th Cir.1998) (where the plaintiff was an in-house lawyer who disclosed confidential information, court weighed the plaintiff's right to oppose allegedly discriminatory acts against her employer's right to ethical representation and the legal profession's interest in assuring the ethical behavior of lawyers and concluded that the plaintiff could not succeed on Title VII retaliation claim because her conduct was not protected activity under Title VII); *O'Day v. McDonnell Douglas Helicopter Co.,* 79 F.3d 756, 763 (9th Cir.1996) (court affirmed summary judgment in favor of employer on the plaintiff's claim that he was retaliated against for participating in the investigation of an unlawful employment practice, stating that it struck the balance in favor of the employer where the plaintiff "committed a serious breach of trust, not only in rummaging through his supervisor's office for confidential documents, but also copying those documents and showing

them to a co-worker"); *Hellman v. Weisberg,* 2007 WL 4218973, at *5 (D.Ariz. 2007), *aff'd* 360 Fed.Appx. 776 (9th Cir. 2009) (district court granted summary judgment in favor of employer on the plaintiff's Title VII claim, finding that the plaintiff failed to establish that she suffered an adverse employment action and also finding that the plaintiff's "unauthorized appropriation, copying, and dissemination of documents, without a showing that disclosure was necessary to preserve the documents, is not protected activity"); *see also Wagner v. City of Holyoke,* 404 F.3d 504, 508 (1st Cir.2005) (where incidents of protected speech also involved the disclosure of confidential material protected by police department regulations and Massachusetts law, as well as breaches of the police department's chain of command, the plaintiff did not show that his discipline was based on his speech rather than other improprieties incidental to that speech). This court therefore concludes that its analysis must include balancing, and this court will proceed to an analysis of the *Pickering* factors.

## C. PICKERING BALANCING TEST

In order to ensure that public employee speech is afforded proper constitutional protections, the Seventh Circuit has traditionally applied the balancing test first announced in *Pickering* and clarified in *Connick v. Myers,* 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983). *Sigsworth,* 487 F.3d at 509. Under the *Connick–Pickering* test, a public employee's speech is constitutionally protected where "(1) the employee spoke as a citizen on matters of public concern, and (2) the interest of the employee as a citizen in commenting upon matters of public concern outweighs the interest of the State as an employer in promoting the efficiency of the public services it performs through its employees." *Sigsworth,* 487 F.3d at 509. This "inquiry into protected status of

speech is one of law, not fact." *Connick,* 461 U.S. at 148 n. 7, 103 S.Ct. 1684; *Spiegla v. Hull,* 371 F.3d 928, 940 (7th Cir.2004).

In this case, there is no real dispute that, when Plaintiff sent the OEIG Report to a reporter, he was speaking as a citizen. *See Doyle,* 2007 WL 2572387, at *5. The question then becomes whether Plaintiff's speech addressed a matter of public concern. In making this determination, this court considers "the content, form, and context of a given statement, as revealed by the whole record." *Cygan v. Wis. Dep't of Corrections,* 388 F.3d 1092, 1099 (7th Cir.2004), *quoting Connick,* 461 U.S. at 147–48, 103 S.Ct. 1684. Speech protesting government waste is of legitimate interest to the general public. *Milwaukee Deputy Sheriff's Ass'n v. Clarke,* 574 F.3d 370, 378 (7th Cir.2009); *Chaklos v. Stevens,* 560 F.3d 705, 713 (7th Cir. 2009). This court therefore has no trouble concluding that the content of the OEIG Report regarding Shalabi, which stated that Shalabi engaged in political fundraising and performed work for his own personal business while on state time and while using state equipment, is a matter of public concern. The Report recounted that a state employee, paid with state funds, had spent compensated time, as well as state resources, on activities not related to his job duties for the state. Moreover, there is no argument that Plaintiff's conduct was not a matter of public concern because it served a purely private interest that solely affected Plaintiff. *See Chaklos,* 560 F.3d at 713, *citing Kokkinis v. Ivkovich,* 185 F.3d 840, 844 (7th Cir.1999). Plaintiff testified that he leaked the OEIG Report because he wanted the public to know about it and because he wanted the FBI to investigate it.

Having found that Plaintiff spoke as a citizen on a matter of public concern, this court must next balance "the interests of [the plaintiff], as a citizen, in

commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Pickering*, 391 U.S. at 568, 88 S.Ct. 1731. "The government is entitled to restrict speech that addresses a matter of public concern 'if it can prove that the interest of the employee as a citizen in commenting on the matter is outweighed by the interest of the government employer in promoting effective and efficient public service.'" *Chaklos*, 560 F.3d at 714, *quoting McGreal v. Ostrov*, 368 F.3d 657, 675–76 (7th Cir.2004). The court considers seven factors when conducting this balancing test: "(1) whether the speech would create problems in maintaining discipline or harmony among co-workers; (2) whether the employment relationship is one in which personal loyalty and confidence are necessary; (3) whether the speech impeded the employee's ability to perform [his] responsibilities; (4) the time, place, and manner of the speech; (5) the context within which the underlying dispute arose; (6) whether the matter was one on which debate was vital to informed decision-making; and (7) whether the speaker should be regarded as a member of the general public." *Chaklos*, 560 F.3d at 714–15. When assessing this balance, "[t]he initial, and often determinative, question is whether the speech interferes with the employee's work or with the efficient and successful operation of the office." *Knapp v. Whitaker*, 757 F.2d 827, 842 (7th Cir.1985); *Volkman v. Randle*, 2012 WL 996907, at *4 (C.D.Ill.2012).

### 1. FIRST FACTOR

Defendants argue that this factor favors them because an environment where an employee snuck into a locked cabinet, took confidential materials, and sent the materials to third parties would create problems in maintaining discipline and harmony among co-workers. Defendants point out that other employees could not help but wonder what confidential information he would take next. Defendants argue that, unless there are consequences for violating confidentiality rules, there will no longer be confidential information.

In response, Plaintiff argues that Defendants mischaracterized the situation in this case. Plaintiff contends that he had been shown a copy of the OEIG Report by Hobbs before he copied the report and, "[i]n addition, Defendants made a public disclosure of the findings of the OEIG report concerning Shalabi on [their] own in December 2006." He argues that he "merely photocopied a report that ... had previously been shown to him regarding an investigation in which the finding had already been made public." This court agrees with Defendants that Plaintiff's argument is factually incorrect because Plaintiff sent a copy of the OEIG Report to a newspaper reporter in October 2006 and the report was made public by DHS in December 2006, when Shalabi's employment was terminated. Plaintiff has made other arguments attacking the confidentiality of the OEIG Report, including the undisputed fact that it had been disclosed to 13 individuals, including Plaintiff.[8] This

---

**8.** Plaintiff has not provided any evidence that the other 12 persons listed should not have had access to the OEIG Report. Plaintiff also argues that the OEIG Report was not confidential because he discussed the report with Randy Malan, a co-worker, and with Jones. Plaintiff cited to a page from the transcript of his testimony at the hearing before ALJ Stralka in support of this argument. On the page cited, Plaintiff testified that he "never dis-

cussed the report with Ms. Jones." On the next page of the transcript, Plaintiff stated that he talked to Malan "about the fact that, you know, nothing was happening to Mr. Shalabi," but that he "did not discuss the report with" Malan. This court concludes that Plaintiff's argument that he discussed the report with Malan and Jones is directly contradicted by his own testimony. Therefore,

court does not find these arguments persuasive. The OEIG Report was confidential and the cover page, which Plaintiff admits reading, clearly stated that it was confidential.

Plaintiff has also argued that he had permission to use the keys from Jones' desk, so he was not "sneaking into locked cabinets" but was merely using a key that was accessible to him and others. This court is not persuaded. The only reasonable inference from the evidence is that Plaintiff had permission to use the key to the locked file cabinet to get office supplies. There is absolutely no evidence which would support an inference that Plaintiff had permission to use the key to retrieve, and open, an envelope clearly marked "CONFIDENTIAL." In fact, this is demonstrated by Plaintiff's own conduct in waiting until Jones left before he took the key to obtain the confidential document.

This court agrees with Defendants that Plaintiff's conduct had "the potential to cause co-worker distrust and the deterioration of working relationships." *See Sullivan v. Ramirez*, 360 F.3d 692, 701 (7th Cir.2004) (referring to the plaintiffs' conduct in tracking other employees' time); *cf. Valentino*, 575 F.3d at 672 (the plaintiff's comments regarding ghost-payrolling found to be constitutionally protected speech where the defendants did not argue that their efficiency concerns outweighed the matters of public concern raised by the plaintiff). Defendants are correct that the State has an interest in not only ensuring that its employees comply with the law concerning confidential documents, but also that employees should not have to worry about their coworkers snooping on them. Defendants have pointed out that Plaintiff's conduct did, in fact, cause disruption because it caused an new investigation by the OEIG, which included investigators going to Hobbs' home to interview him. This court concludes that Defendants could reasonably conclude that Plaintiff's conduct was disruptive. *Cf. McGreal*, 368 F.3d at 680 (where the employer was more concerned with the plaintiff police officer's statements requesting investigations into improper conduct, including conduct involving the Mayor, than dangerous and criminal behavior by another police officer, the employer's purported concern with maintaining harmony in the workplace was not reasonable). Therefore, the first factor weighs in favor of Defendants.

### 2. SECOND FACTOR

Defendants argue that the second factor weighs in their favor because maintaining confidences relating to OEIG investigations was necessary as part of Plaintiff's employment with the State, citing 5 Ill. Comp. Stat. 430/50–5(f). Defendants contend that Plaintiff's misconduct destroyed the confidentiality of what the Illinois legislature had determined, in the Ethics Act, was confidential and not subject to the Freedom of Information Act. Defendants argue that "[d]iscipline is appropriate for an employee who circumvents investigatory proceedings and violates a public employer's confidentiality policy by disclosing covered information to reporters even when the information disseminated is in the public interest."

Plaintiff has countered this argument by again arguing that the OEIG Report was not considered confidential. Plaintiff also argues that his speech raised issues of public concern which outweigh the government's interests in stifling the speech.

This court has already concluded that the OEIG Report was confidential. This court further concludes that the interest in

no further discussion of this argument is necessary.

maintaining the confidentiality of the OEIG Report, and any persons named in the report as providing information about Shalabi's conduct, outweighed Plaintiff's interest in making the Report public because of his belief that Shalabi's termination was not happening fast enough. *See Doyle*, 2007 WL 2572387, at *7 (disclosure of confidential information to a news reporter, in violation of state law, not constitutionally protected speech); *Douglas*, 144 F.3d at 377 (disclosure of confidential information by in-house lawyer not protected activity); *O'Day*, 79 F.3d at 763–64 (the plaintiff was not engaged in protected activity where he rummaged through supervisor's office for confidential documents and copied them). The second factor weighs in favor of Defendants.

### 3. THIRD FACTOR

Defendants argue that the third factor weighs in their favor because Plaintiff could not perform his job while he was being interviewed by OEIG investigators concerning his misconduct. Defendants also argue that the fact that Plaintiff violated the law was itself enough to demonstrate that he was not properly performing his duties. Plaintiff responds that his speech occurred after work hours and on his own time and that he "did nothing during office time that would have impeded his ability to perform his daily responsibilities." This court notes that both positions have some merit, and this factor presents a close question. However, this court concludes that the factor weighs slightly in favor of Defendants.

### 4. FOURTH FACTOR

Defendants contend that the fourth factor, the time, place, and manner of the speech, weighs in their favor because, while the consummation of Plaintiff's misconduct occurred at home after hours, it was based upon his misconduct in taking and photocopying the OEIG Report at

work. Defendants also argue that Plaintiff's actions were not the proper manner and means for handling the issue because he made no attempt to raise his concerns about the Shalabi matter internally and instead inappropriately released the confidential report to the news media. *See Greer v. Amesqua*, 212 F.3d 358, 371–72 (7th Cir.2000); *Patkus v. Sangamon–Cass Consortium*, 769 F.2d 1251, 1258 (7th Cir. 1985).

Plaintiff responds that Defendants were correct that his protected speech occurred at home and not at work. Plaintiff also argues that he feared a coverup so could not have reported his suspicions of a coverup to internal investigations. He argues that he "could not report his suspicions to the very people who were possibly engaging in the coverup." This court has already concluded that Plaintiff has provided no evidence, other than supposition and conjecture, of a coverup regarding the Shalabi matter. This court also concludes that Defendants are correct that a significant portion of Plaintiff's conduct occurred at the workplace. Accordingly, this court concludes that this factor weighs in favor of Defendants.

### 5. FIFTH FACTOR

Defendants argues that the fifth factor, the context in which the underlying dispute arose, favors them because Plaintiff had no basis for divulging the confidential OEIG Report to a newspaper reporter or to an attorney. Plaintiff argues in response that he sent the OEIG Report to the newspaper because "he was afraid that the administration was engaged in a cover up." He also contends that he was acting as a whistleblower, so his conduct is protected.

This court has already concluded that Plaintiff has not shown any basis for a belief that a coverup was occurring and

was not acting as a whistleblower. This factor weighs in favor of Defendants.

## 6. SIXTH FACTOR

Defendants argue that the sixth factor, whether the matter was one on which debate was vital to informed decision-making, favors them. They contend that debate was not needed on this matter because DHS was already in the process of terminating Shalabi's employment. Plaintiff argues that this is not the case because, at the time he copied the report, no termination had occurred. Plaintiff also argues that, because an election was to be held weeks later, in November 2006, "it was of vital importance for the public to be informed about the public officials running for office," particularly Governor Blagojevich.

This court has already concluded that the fact that Shalabi had not yet been terminated on the date Plaintiff copied the report, approximately two weeks after the OEIG Report had been written, does not show the existence of a coverup. Plaintiff has no evidence that DHS was not in the process of terminating Shalabi's employment. However, this court recognizes that the public has the right to be informed regarding public corruption and that the information disclosed was important information for the voting public. This court therefore concludes that both Defendants and Plaintiff have a valid argument regarding this factor and the factor does not weigh in favor of Defendants or Plaintiff.

## 7. SEVENTH FACTOR

Defendants argue that the seventh factor, whether the speaker should be regarded as a member of the general public, weighs in their favor because Plaintiff would not have had access to the OEIG Report if he was not a DHS employee. In response, Plaintiff argues that the "critical determination is whether the individual was speaking 'more like a citizen or a disgruntled employee whose statements are primarily of personal interest.' " *Spiegla*, 371 F.3d at 938, *quoting Colburn v. Trs. of Ind. Univ.*, 973 F.2d 581, 585 (7th Cir.1992). This court agrees with Plaintiff. Because this court has already concluded that Plaintiff was speaking as a member of the public, this factor weighs in favor of Plaintiff.

## D. CONCLUSION

After careful consideration of the *Pickering* factors, this court concludes that five of the seven factors weigh in favor of Defendants. Therefore, this court concludes that Plaintiff's speech was not protected and Defendants are entitled to summary judgment on Plaintiff's First Amendment claim. *See Sullivan*, 360 F.3d at 703.

This court will, however, briefly address Plaintiff's remaining arguments. Plaintiff states in his Response that Defendants' Motion for Summary Judgment does not address his "allegations that there was a common scheme operated by the Office of the Governor and others to build political power by controlling the employment system for the State of Illinois" and that those "allegations are critical to the Plaintiff's theory of the case that the true motive for termination of . . . his employment was to protect that system." This court reminds Plaintiff that, at this stage of the proceedings, allegations are not sufficient to withstand summary judgment. Plaintiff has presented this court with little actual evidence that any such "common scheme" existed, other than common knowledge about Governor Blagojevich's involvement in corruption. More importantly, Plaintiff has provided absolutely no evidence that any of the Defendants were involved in such a scheme. Plaintiff has relied on inconsistencies in Defendants' testimony regarding the process by which he was

terminated and the involvement of Ryan from the Governor's office. This evidence, however, does not undermine the facts showing that Plaintiff was terminated for his conduct of surreptitiously taking a confidential document and sharing it with a newspaper reporter. This court concludes that it falls far short of supporting Plaintiff's belief that he was terminated as part of the alleged "common scheme." Plaintiff has also relied on the fact that his termination was delayed from December 2006 to October 2007 and none of the Defendants could explain this delay. This court agrees with Defendants that there is no evidence that the delay in terminating Plaintiff's employment was unwarranted where there were issues relating to the interplay between the Ethics Act and the Personnel Code and the potential for a First Amendment challenge, a challenge which of course occurred.

This court further notes that Defendants have claimed that they are entitled to qualified immunity concerning Plaintiff's First Amendment claim. Plaintiff has countered that qualified immunity does not apply in this case because he has sought injunctive relief (although apparently only as to Defendant Adams). *See Moss,* 614 F.3d at 712 (the qualified immunity defense protects government defendants from an action for money damages, but not from a suit for injunctive relief). Because this court has already concluded that Plaintiff's conduct was not constitutionally protected and Defendants are entitled to summary judgment for that reason, there is no need to address this issue. *See Sullivan,* 360 F.3d at 703.

IT IS THEREFORE ORDERED THAT:

(1) The clerk is directed to terminate the Illinois Department of Human Services and the Illinois Civil Service Commission as Defendants in this action.

(2) The Motion for Summary Judgment (# 62) filed by Defendants Carol Adams, Jerome Butler, Elizabeth Gil, and Matt Ryan is GRANTED. Judgment is entered in favor of Defendants and against Plaintiff.

(3) This case is terminated.